# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Michael M.,**
**Petitioner Below, Petitioner**

**FILED**

**January 5, 2018**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)  No. 17-0112** (Preston County 15-C-188)

**Ralph Terry, Acting Warden,**
**Mount Olive Correctional Complex,[1]**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner Michael M.,[2] by counsel Jeremy B. Cooper, appeals the Circuit Court of Preston County's "Opinion Order Denying Petition for Writ of Habeas Corpus" entered on November 29, 2016. Respondent David Ballard, Warden, Mount Olive Correctional Complex, by counsel Sarah B. Massey, filed a response.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Following a trial in 2001, a jury convicted petitioner of one count of sexual assault in the first degree and five counts of sexual abuse by a parent, guardian, or custodian. The victim was petitioner's daughter, who was between ten and twelve years old at the time of the crimes. The victim, age fourteen at the time of the trial, testified that petitioner forced her to lie naked with him in his bed and touch his penis; digitally penetrated her vagina; put his mouth on her breasts; and put his mouth on her vagina. The circuit court sentenced petitioner to an effective term of incarceration of twenty-five to fifty-five years.

---

[1] Under Rule 41(c) of the West Virginia Rules of Appellate Procedure, we have substituted the name of the current warden of Mount Olive Correctional Complex.

[2] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

The record reveals that the victim initially disclosed the sexual abuse to a friend, who told the victim's guidance counselor at her school. When confronted by the guidance counselor, the victim denied that the abuse occurred for fear that her parents would fight. However, the victim ultimately disclosed petitioner's conduct to her mother, who immediately reported the allegations to the Preston County Sheriff's Department. Corporal Kenneth Wotring reported to petitioner's residence the following evening and interviewed the victim. Also, petitioner's father was present, allegedly armed with a loaded handgun, threatening to kill petitioner.

When petitioner arrived home, the officers explained that they were there because of the sexual abuse allegations and petitioner agreed to talk to Corporal Wotring. Petitioner waived his Miranda rights and gave a statement, in which he stated, in part, that he woke up with his daughter, who was naked from the waist down, sitting on his chest in a compromising sexual position; that he was tickling her, and it overcame her, which resulted in her sitting on his chest; that "[a]s far as holding her down, she has been naked a couple of times, I have been naked all of the time. I never intended it to be sexual at all. I held her down. I tickled her;" that he did not digitally penetrate her vagina, but that the victim told him he had done so while he was asleep; that the victim had also told him that he had placed his mouth on her vagina and breasts while he was asleep; that "there were two or three, four times that maybe it happened[;]" and that he ejaculated after one of the encounters with the victim. Corporal Wotring arrested petitioner shortly after petitioner gave his statement.

Relevant to the instant appeal, petitioner moved to suppress his statement on the basis that it was involuntarily given. That is, petitioner claimed that his father was threatening to harm him, and Corporal Wotring promised to place petitioner in protective custody if he gave a statement. The circuit court denied petitioner's motion and allowed petitioner's statement to be played for the jury at trial. At trial, petitioner testified and claimed that his statement was "as close he could come [to the truth]," despite previously claiming that it was improperly coerced by Corporal Wotring. Petitioner also moved to suppress all evidence that was obtained during the warrantless search of petitioner's residence. The circuit court denied this motion, as well.

Based solely on the testimony of Corporal Wotring, the grand jury returned a twenty-count indictment against petitioner. The first ten counts charged petitioner with first degree sexual assault and included the following language for each count:

> That between the __ day of _____, 1997, and the 26th day of May 1999, in Preston County, West Virginia, [petitioner] committed the offense of "First Degree Sexual Assault" by unlawfully and feloniously subjected [the victim] to sexual intrusion or sexual intercourse, the said [victim] being eleven (11) years old or less, and the said [petitioner] being fourteen (14) years old or more, in violation of West Virginia Code § 61-8B-3, against the peace and dignity of the State.

Counts 11 through 20 charged petitioner with sexual abuse by a custodian and included the following language for each count:

That between the __ day of _____, 1997, and the 26ᵗʰ day of May 2000, in Preston County, West Virginia, [petitioner] committed the offense of "Sexual Abuse by a Custodian" by unlawfully and feloniously engaging in or attempting to engage in sexual intercourse or sexual contact with [the victim], a child who was under his care, custody and control, in violation of West Virginia Code § 61-8D-5, against the peace and dignity of the State.

Petitioner moved to dismiss the indictment on the grounds that it was vague and did not adequately advise him as to the charges. The circuit court ruled that time was not of the essence with respect to the offenses charged, and, thus, refused to dismiss the indictment. However, following a hearing in March of 2001, the circuit court granted petitioner's motion for a bill of particulars with the caveat that the State was to "specify as best the [S]tate can the specific date, time, place, and manner in which the [S]tate contends the acts charged against [petitioner] were committed." The victim's mother initially refused to allow the State to interview the victim in order for the State to obtain the details necessary for the bill of particulars. When the State ultimately filed its bill of particulars in August of 2001, it contended that the twenty counts in the indictment stemmed from ten separate events or acts. Additionally, the State detailed five specific incidents that the victim was able to recall.

At the conclusion of the State's case-in-chief, the circuit court partially granted petitioner's motion for judgment of acquittal, finding that the victim testified with specificity to only five incidents that occurred in Preston County. From those five incidents, the circuit court allowed only one count of first degree sexual assault to go to the jury because the victim was over the age of twelve for at least three of them, and one of the incidents did not involve sexual intercourse or sexual intrusion. The circuit court found that all five incidents warranted sending five counts of sexual abuse by a parent, guardian, or custodian to the jury. Therefore, the circuit court sent Counts 1, 11, 12, 13, 14, and 15 to the jury, and the jury returned a guilty verdict on each of those six counts. The court sentenced petitioner to an effective sentence of twenty-five to fifty-five years in prison. Petitioner filed a petition for appeal with this Court, which this Court refused by order on October 30, 2002.

At petitioner's request, the circuit court appointed habeas counsel for petitioner in April of 2004. Habeas counsel filed the instant petition for a writ of habeas corpus in December of 2015. Petitioner raised the following grounds for habeas relief in his memorandum of law in support of his petition: (1) ineffective assistance of trial counsel; (2) defective indictment; (3) fraudulent grand jury testimony by Corporal Wotring; (4) prosecutor's improper reference to the transcript of petitioner's statement; (5) improper denial of petitioner's request for a continuance; (6) erroneous admission of petitioner's statement and evidence seized without consent; (7) biased presentence report; and (8) cumulative error. The circuit court held an omnibus hearing in June of 2016, and entered its order on November 29, 2016, addressing and denying all alleged grounds for habeas relief. This appeal followed.

This Court reviews the circuit court's denial of a habeas petition under the following standard:

3

In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006). On appeal, petitioner raises the following seven assignments of error:

(1) the circuit court erred by denying habeas relief on the basis of ineffective assistance of counsel; (2) the circuit court erred by denying habeas relief on the basis of an indictment that failed to include the essential elements of the crime, or to put petitioner on notice of the charge which he was required to defend; (3) the circuit court erred by denying habeas relief on the basis of fraudulent testimony before the grand jury; (4) the circuit court erred by denying habeas relief upon a wrongfully denied continuance; (5) the circuit court erred by denying habeas relief on the basis of the improper admission of evidence that was unconstitutionally obtained; (6) the circuit court erred by denying habeas relief based upon the use of biased pre-sentence investigation at petitioner's sentencing; and (7) the circuit court erred cumulatively to the prejudice of petitioner.

With the exception of one of the bases upon which petitioner argues his trial counsel was ineffective,[3] petitioner raises the same arguments on appeal that he raised in the habeas proceeding before the circuit court. As to petitioner's remaining assignments of error, we find no error or abuse of discretion by the circuit court. Our review of the record supports the circuit court's decision to deny petitioner post-conviction habeas corpus relief based on these alleged errors, which were also argued below. Indeed, the circuit court's order includes well-reasoned findings and conclusions as to the assignments of error raised on appeal. Given our conclusion that the circuit court's order and the record before us reflect no clear error or abuse of discretion, we hereby adopt and incorporate the circuit court's findings and conclusions as they relate to petitioner's assignments of error raised herein and direct the Clerk to attach a copy of the circuit court's November 29, 2016, "Opinion Order Denying Petition for Writ of Habeas Corpus" to this memorandum decision.

For the foregoing reasons, we affirm.

---

[3] For the first time on appeal, petitioner contends that his trial counsel was ineffective by failing to object to allegedly "impermissible" argument by the State in its closing argument. It appears that petitioner challenges the manner in which the prosecuting attorney explained to the jury why certain charges had been dismissed. This claim was not raised below and petitioner fails to claim "plain error" on appeal. Accordingly, this Court declines to review petitioner's argument in this regard. *See* Syl. Pt. 2, *State v. Salmons*, 203 W. Va. 561, 509 S.E.2d 842 (1998) ("As a general matter, a defendant may not assign as error, for the first time on direct appeal, an issue that could have been presented initially for review by the trial court on a post-trial motion.").

Affirmed.

**ISSUED:**  January 5, 2018

**CONCURRED IN BY:**

Chief Justice Allen H. Loughry II
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

IN THE CIRCUIT COURT OF PRESTON COUNTY, WEST VIRGINIA

STATE EX REL. MICHAEL ███████ M█████,
    Petitioner,

v.
                                      //Case No. 15-C-188
                                      Honorable Lawrance S. Miller, Jr.

DAVID BALLARD,
Warden, Mt. Olive Correctional Complex,
    Respondent.

## OPINION ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

On June 3, 2016, came the Petitioner, Michael ███████ M███, in person and by counsel

Wiley Newbold, and came the Respondent Warden by Prosecuting Attorney Melvin C. Snyder,

III, for an omnibus hearing on Petitioner M███'s December 2, 2015 Petition for Writ of Habeas

Corpus. After considering the Petition for Writ of Habeas Corpus, the Memorandum of Law in

Support of Petition for Writ of Habeas Corpus, the arguments of the parties, the proposed

findings of fact and conclusions of law presented by Petitioner, and the pertinent legal

authorities, the Court finds and concludes that Petitioner ░ has failed to prove the

allegations contained in his Petition by proof beyond a reasonable doubt. Accordingly, for the

reasons explained herein, the Court finds and concludes that the Petition for Writ of Habeas

Corpus should be denied.

## FINDINGS OF FACT AND PROCEDURAL HISTORY

During the night of May 9, 2000, J░ M░ told her mother, C░ M░ that her

father, Petitioner Michael M░ , had sexually abused her. (Trial Tr. 370-71, 501, Case No. 00-

F-71.) On that same night, Corporal Kenneth Wotring of the Preston County Sheriff's

Department was told by a secretary that he had received a call from C░ M░ about the

alleged sexual abuse. (*Id.* at 406.) Corporal Wotring testified in the trial that Ms. M░ came

1

in to the Sheriff's Department and spoke with him about the alleged abuse, and she indicated to Corporal Wotring that she wanted the police to be at her home when Petitioner M     arrived because he had a violent temper. (*Id.* at 407.)

Corporal Wotring, along with several other officers, went to the M     residence shortly after midnight on May 10, 2000, where Corporal Wotring testified they were met by a "very angry" D    M,    (Petitioner's father) who had a handgun strapped to his side. (*Id.* at 407-08.) Corporal Wotring testified that one of the other officers asked D    M     several times to unload the gun, and he believed that on the third request Mr. M     did so. (*Id.* at 408.)

Corporal Wotring testified at the omnibus hearing in the present case that he initially interviewed J.M., the then-twelve year old daughter of Michael M    . (*See* Omnibus Hr'g Tr. 20, June 3, 2016.) According to the "Action Taken," which was introduced as Petitioner's Exhibit 1 at the omnibus hearing, J.M. told Corporal Wotring that her father had, *inter alia*, assaulted her "100 times at least" and that he "licks her vagina[,]" and that he "takes off her clothes and sticks his finger in her vagina[.]" (Pet'r's Ex. 1.) She told him that the assaults began when she was ten years old. (*Id.*)

Corporal Wotring testified at the underlying trial that after he had talked to J.M. for about 40 minutes, Michael M     arrived home. He testified he and three other officers approached Petitioner M    , and he explained to M     why they were there. (Trial Tr. at 409.) Corporal Wotring testified that Petitioner M     agreed to give him his side of the story. (*Id.*) Petitioner M     then gave Corporal Wotring a post-*Miranda* warning statement about the circumstances concerning J.M.'s accusations.

After a hearing conducted on August 7, 2001, this Court found that Petitioner M    s statement was freely and voluntarily given, and the statement was played for the jury during the

2

trial. At the beginning of that statement, Michael M    answered, "no," when he was asked by

Corporal Wotring if he had been promised anything in return for giving the statement. When

asked to explain how the situation with his daughter began, he said:

> The situation began while I was sleeping, my daughter was sitting with me. This
> was the first time it ever happened. I woke up and we were in a compromising
> sexual position. My daughter was sitting on my chest, naked from the waist
> down and we had sat and discussed what went on. She told me what happened.
> I told her that this is something that a father and daughter should not be doing
> and it wasn't right.

(Pet'r's Statement at unnumbered 2.)[1] He said that his daughter "said that I was playing with

her. It overcome her and she wound up sitting on my chest." (*Id.*)

When asked how many times this had occurred, Petitioner M    old Corporal Wotring

that he "woke up probably four or five times in the last couple of years." (*Id.*) He stated that

this always happened in his house. (*Id.*)

Petitioner M    also told Corporal Wotring the following: "As far as holding her down,

she has been naked a couple of times, I have been naked all the time. I never intended it to be

anything sexual at all. I held her down, I tickled her." (*Id.*) He stated that he had never stuck

his finger in her vagina while he was awake, although his daughter had said that he had done so

while he was asleep. He told Corporal Wotring that if J.M. told him something, he would

believe her. (*Id.* at unnumbered 3.) He denied that he had ever put his penis near her vagina,

but he had perhaps placed his penis near her anus while he was holding her down and tickling

her. He also said that his daughter had said he had placed his mouth on her vagina and her

breasts while he was sleeping. (*Id.* at unnumbered 4.) He also admitted to having ejaculated

one time during these encounters: "While I was holding her down and tickling her, I got

---

[1] The citation is to the transcribed statement. Although not exactly accurate, the discrepancies were minor and did not affect the substance of the transcription. This Court ruled at trial that the jury could hear the tape recording; however, the Court did not admit the transcript. (*See* Trial Tr. at 419-20.) The Court cites the transcript here for ease of reference.

3

aroused. I sent her away. You know, I told her to get up and go feed the dogs or whatever I told her to do. By then it was just too late." (*Id.* at unnumbered 5.)

Corporal Wotring placed Petitioner M⸱ ⸱nder arrest shortly after he gave the statement. He was charged with five counts of Sexual Abuse by a Parent, Guardian, or Custodian. Attorney Howard G. Higgins, Jr., was appointed to represent Mr. M⸱ . A preliminary hearing was conducted on May 26, 2000, and a Preston County magistrate found probable cause to bind the case over to the Circuit Court.

The case was presented to the Preston County Grand Jury on October 17, 2000. Assistant (at that time) Prosecuting Attorney Melvin C. Snyder, III, presented the case to the Grand Jury. The presentment consisted solely of the testimony of Corporal Wotring. Corporal Wotring told the Grand Jury that J.M. had told him that her father had sexually assaulted her since she was ten years old, and that he would always pretend to be asleep when he did those things. (Grand Jury Tr. at 5, Oct. 17, 2000.) He testified to the Grand Jury that Michael M⸱ told him during the statement that "he would wake up and his daughter, J[.M.], would be sitting on his face." (*Id.* at 6.) He testified that M⸱ admitted to ejaculating at least one time. (*Id.*) He further testified that M⸱ "acknowledged at least I think five or six times he said that he has performed oral sex on his daughter." (*Id.* at 7.)

The Grand Jury returned a 20-count indictment, the first ten of which charged Petitioner M⸱ with First Degree Sexual Assault in violation of West Virginia Code § 61-8B-3. Each of the first ten counts charged Petitioner M⸱ with identically-worded language:

> That between the ___ day of _____, 1997, and the 26th day of May 1999, in
> Preston County, West Virginia, Michael M⸱ committed the offense of
> "First Degree Sexual Assault" by unlawfully and feloniously subjecting J[.]M[.],
> to sexual intrusion or sexual intercourse, the said J[.]M[.] being eleven (11) years
> old or less, and the said Michael M⸱ ⸱eing fourteen (14) years old or

4

more, in violation of <u>West Virginia Code</u> § 61-8B-3, against the peace and dignity of the State.

(Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 of the Indictment in Case No. 00-F-71.)

Counts 11 through 20 each charged Petitioner M    with Sexual Abuse by a Custodian in violation of West Virginia Code § 61-8D-5. Each of these counts were identically worded:

> That between the ___ day of _____, 1997, and the 26th day of May 2000, in Preston County, West Virginia, Michael    M  committed the offense of "Sexual Abuse by a Custodian" by unlawfully and feloniously engaging in or attempting to engage in sexual intercourse or sexual contact with J[.]M[.], a child who was under his care, custody and control, in violation of <u>West Virginia Code</u> § 61-8D-5, against the peace and dignity of the State.

(Counts 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20 of the Indictment in Case No. 00-F-71.)

On December 28, 2000, attorney Higgins filed a Motion to Suppress Evidence in which he contended that Petitioner M   's statement should be suppressed. As a basis for the motion, Petitioner contended that the "statement was involuntarily coerced in violation of [his] constitutional rights . . . ." He also filed a Motion to Suppress Illegally Seized Evidence, in which he contended that the officers seized him and his property by entering private property without a duly issued warrant, probable cause, or a crime being committed in the officer's presence.

Petitioner M  also filed a Motion to Dismiss the Indictment. In that motion, he contended it was "impossible from the face of the indictment to prepare an adequate alibi defense or properly respond to these charges. He further contended that "upon information and belief the hearsay presented to secure this indictment was known not to be accurate, true, and recanted, if made at all, by the alleged victim, by the Prosecuting Attorney and her complaining witness." Petitioner contended that it was "clearly an abuse of the grand jury process[,]" and he requested a transcript of the grand jury testimony. In conjunction with this motion, Petitioner

5

M       also filed a Motion for Bill of Particulars and a Motion to Disclose Matters Occurring Before the Grand Jury.

Thereafter, in the early part of 2001, Petitioner M      and attorney Higgins began to part ways in how to strategically defend this case. On March 14, 2001, the Circuit Court of Preston County conducted a hearing in Case No. 00-F-71. At that hearing, the Court heard the representations of both attorney Higgins and Petitioner M      The Court first considered a motion to withdraw filed by attorney Higgins that was based in part on two letters from Mr. M      . It appeared at that time that Petitioner M      sought to attack Corporal Wotring's investigation. Petitioner M      told the Court that he felt that "there is a reluctance on Mr. Higgins' part to bring out everything against Corporal Wotring." (Trial Tr. at 10.)[2] Attorney Higgins stated that he thought "it is almost as if we are dealing with a criminal case and also trying to pursue perhaps a civil rights violation" and that "several of the issues [M      ] wishes to raise and pursue are issues that really do not affect th[e] elements that the state has to prove." (*Id.* at 11-12.)

Attorney Higgins indicated to the Court that he could continue to represent Mr. M      , and Petitioner M      indicated that he would be amenable to attorney Higgins representing him "as long as he's willing to bring everything out at the trial . . . ." (Trial Tr. at 11.) However, on March 15, 2001, the day after the hearing on attorney Higgins's motion to withdraw, Mr. M      again wrote the Court and asked for a new attorney because Mr. Higgins allegedly was "not bringing all the information to [the Court's] attention." (Letter from P      M      to Court, March 15, 2001.) In response, attorney Higgins filed a Motion to Withdraw as Counsel on

---

[2] The transcript prepared by certified court reporter Rebecca Harris for Mr. M      's direct appeal to the Supreme Court of Appeals of West Virginia includes all of the pretrial hearings, the trial, and the post-trial motions and sentencing hearing. For ease of reference and to distinguish it from the transcripts of the hearings in the present habeas corpus case, the Court cites it as "Trial Tr."

6

April 16, 2001, which this Court granted after conducting a hearing on the motion that same day. The Court entered an Order on April 16, 2016, in which it appointed the Public Defender Corporation as counsel for Mr. M   ; Chief Public Defender Randy R. Goodrich entered a Notice of Appearance of Counsel the next day.

Also on March 14, 2001, the Court heard argument on the Motion to Dismiss the Indictment. Petitioner (then-defendant) argued that the indictment was vague regarding when the alleged crimes had taken place, and that therefore it did not adequately advise Mr. M    as to his charges. (Trial Tr. at 14-15.) The Court ruled that time was not of the essence of the offense; however, the Court granted the Motion for a Bill of Particulars with the caveat that the State was to "specify as best the [S]tate can the specific date, time, place, and manner in which the [S]tate contends the acts charged against Mr. M    were committed." (*Id.* at 23.) The Court further, *sua sponte*, ordered the State to specify whether it contended the 20 charges were based on ten incidents or 20 separate incidents. (*Id.*)

Finally, on March 14, 2001, the Court heard the Motion to Disclose Matters Occurring Before the Grand Jury. Attorney Higgins argued that he needed it because Corporal Wotring was expected to testify at the trial, and that he also needed it for matters relating to a possible motion to dismiss the indictment. (*See id.* at 25.) The Court granted the request in as much as it allowed disclosure of the grand jury proceedings ten days prior to trial; the Court denied the request for earlier disclosure because Petitioner M    had not made a sufficient showing pursuant to Rule 6(e)(3)(C)(ii) for an earlier disclosure.[3] (*Id.* at 27.) The State served the Grand Jury Transcript on attorney Higgins on March 27, 2001.

---

[3] Rule 6(e)(3(C)(ii) of the Rules of Criminal procedure provides that disclosure may be made "when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury[.]"

7

On August 3, 2001, the Court conducted another hearing, during which the Court had intended to consider a previously filed Motion to Suppress Evidence (which regarded Defendant's statements) and a Motion to Suppress Illegally Seized Evidence. Corporal Wotring was unavailable to testify that day, and the Court was forced to reschedule the hearing on those motions until closer to trial. (*See* Tr. at 52-53.) The Court did, however, consider a "Motion in Limine" filed that same day by attorney Goodrich, in which he

> move[d] the Court in Limine to exclude and prohibit the State from mentioning or attempting to admit before the jury in this case any information or materials or evidence relating to sexual intrusion or sexual intercourse alleged to have occurred on or after May 26, 1999, as the date of birth of J[.] M[.] is reflected in the discovery as being May 26, 1987, and she became twelve (12) years of age on May 26, 1999, and any events occurring after that date would not be admissible for the purpose of proving the allegations set forth in counts one (1) through ten (10) of the indictment charging First Degree Sexual Assault.

(Def.'s Mot. in Limine, Aug. 3, 2001.)

> Further, Mr. M

> move[d] the Court in Limine to exclude and prohibit the State from mentioning or attempting to admit before the jury in this case any information or materials to prove the allegations in counts eleven (11) through twenty (20) unless the State is able to identify the date of the offense as being prior to or subsequent to June 12, 1988, as the statute was amended as of that date whereby the penalty was changed from imprisonment of not less than five (5) nor more than fifteen (15) years to a penalty of not less than ten (10) nor more than twenty (20) years, thereby causing confusion to the jury and the Court in applying the proper penalty to the Defendant, if convicted.

(*Id.*)[4]

In sum, Mr. M argued that he needed more specificity regarding the timeframes of the alleged crimes because he was charged under subsection (a)(2) of the statute. *See* W. Va. Code 61-8B-3(a) (1991) (providing that sexual assault in the first degree could be committed by either engaging in sexual intercourse or sexual intrusion with another person and in so doing

---

[4] Defendant also moved the Court to exclude certain items of evidence. Those items of evidence are not at issue in this habeas corpus proceeding.

8

causing serious bodily injury or employing a deadly weapon in the commission of said act, or, as in the case at bar, when a person being fourteen years old or more engaged in sexual intercourse or sexual intrusion with another person who was eleven years old or less). Defendant sought to limit any evidence of any sexual acts alleged to have occurred after J.M. turned 12 years of age, which was May 26, 1999. (*See* Trial Tr. at 43-46.)

Regarding counts 11 through 20, which charged Petitioner M      with Sexual Abuse by a Parent, Guardian, or Custodian under West Virginia Code § 61-8D-5, Defendant sought in his Motion *in Limine* to force the State to identify the specific date of the alleged offense, because the penalty under the statute had increased on June 12, 1998, from five to 15 years in the penitentiary to 10 to 20 years in the penitentiary. *Compare* W. Va. Code § 61-8D-5 (1991) *with* W. Va. Code § 61-8D-5 (1998).

At the August 3, 2001 hearing on the Defendant's Motion in Limine filed by attorney Goodrich, the Court indicated that it had granted a motion for a bill of particulars at the March 14, 2001 hearing, but that it had not at that time been filed in the official court file. Prosecuting Attorney Ron Brown explained to the Court that J.M.'s mother had refused to allow J.M. to be interviewed by his office, and thus he had not been able to provide the bill of particulars. Despite her prior recalcitrance, the victim's mother was outside the courtroom at that time with the victim, and had apparently indicated to attorney Goodrich that she was willing allow J.M. to be interviewed by the State. (*See* Trial Tr. at 58-60.) Based on those circumstances, the State believed that after the interview it could promptly provide Mr. M      and his counsel with a bill of particulars.

The State filed its Bill of Particulars on August 7, 2001. In it, the State contended that the 20 counts in the Indictment were based on ten separate events or acts. The State further

9

contended that during the interview with J.M., it learned that she was able to recall five specific incidents. The State detailed each event. (*See* Bill of Particulars, Aug. 7, 2001.)

On August 7, 2001, the Court conducted a hearing on the Motion to Suppress Evidence (regarding Defendant's statement) and the Motion to Suppress Illegally Seized Evidence.[5] Corporal Kenneth Wotring testified about his involvement with the case and his interview with Michael M₁ Corporal Wotring testified that a secretary told him he had received a phone call from C      M  – wife of Petitioner M      and mother of J.M. – regarding a sexual assault type investigation. Thereafter, he received a phone call himself from C⁴      M herself who informed him that her husband had been sexually assaulting their daughter. (Trial Tr. at 73.) He testified that he spoke to J.M. in his cruiser outside her grandparents' (Petitioner M      s parents) home that night before Michael M₁      returned home.[6]

Corporal Wotring testified that upon his arrival,

the father of Michael M      was armed with a handgun and he had made a statement that he was going to shoot his son when he showed up, that he was very – they were extremely upset. Trooper Wyatt advised Mr. M      the defendant's father, on several times to – that he needed to unload the firearm.

(*Id.* at 75-76.)

Corporal Wotring testified at the suppression hearing that Michael M      arrived later, and that he advised Mr. M      vhy he was there. He further testified that Mr. M      agreed to talk to him, and Mr. M₁      got in the front seat of his cruiser with him. At that point, Corporal Wotring testified that he advised Mr. M      of his *Miranda* rights, and Mr. M      subsequently

---

[5] Both of those motions had been filed by attorney Howard Higgins on December 28, 2000.
[6] The record shows that Michael and C      M      lived next door to Michael's parents, D      and M₁ M

10

gave a statement.[7] At some point thereafter, Corporal Wotring turned on his audiotape recorder

and recorded the statement. It was transcribed by the Sheriff's Department's secretary.[8]

Corporal Wotring testified that he did not threaten Mr. M in any way, nor did he

promise him anything. (Trial Tr. at 85.) Further, he testified that Mr. M was not

intimidated in any way to give him a statement, which was corroborated by Mr. M 's

statement wherein he said he was not threatened, intimidated, or promised anything in exchange

for making a statement. (*Id.*) He also testified, which is corroborated by the recorded

statement, that he asked at the end of the statement whether Mr. M had been forced to say

anything. Mr. M said no. (*Id.*; *see* Tr. of Def.'s Statement (last page).) Mr. M also said

in his statement that he gave it voluntarily. (Tr. of Def.'s Statement (last page).)

Mr. M admitted in his statement to inappropriate sexual contact with his daughter.

For example, he told Corporal Wotring:

> The situation began while I was sleeping, my daughter was sitting with me. This
> was the first time it ever happened. I woke up and we were in a compromising
> sexual position. My daughter was sitting on my chest, naked from the waist
> down and we had sat and discussed what went on. She told me what happened.
> I told her that this is something that a father and daughter should not be doing
> and it wasn't right. . . . She said that I was playing with her. It overcome her
> and she wound up sitting on my chest.

(Tr. of Def.'s Statement.) In response to how many times this had occurred, Mr. M told

Corporal Wotring, "Oh, I woke up probably four or five times in the last couple years." (*Id.*)

Petitioner M also told Corporal Wotring the following:

> As far as holding her down, she has been naked a couple of time, I have been
> naked all the time. I never intended it to be anything sexual at all. I held her

---

[7] The State introduced at the suppression hearing as State's Exhibit E-2 a copy of the *Miranda* rights statement form signed by Michael M On it, Corporal Wotring had written "SEXUAL ALLEGATIONS MADE BY YOUR DAUGHTER" as the purpose for the interview. The same exhibit was introduced at trial as State's Exhibit 1. *See* Syl. pt. 4, *State v. Vance*, 162 W. Va. 467, 250 S.E.2d 146 (1978) (adopting the "Massachusetts Rule" that allows the jury to consider the voluntariness of a confession after a trial court has made an initial ruling).
[8] *See* Note 1, *supra.*

11

down, I tickled her. We laughed. We talked. We giggled and that was the end of it, as far as I thought.

(*Id.*)

Petitioner M̶ told Corporal Wotring, in response to the officer's questions, that his daughter had told him that he had placed his mouth on her vagina and her breasts while he was sleeping. (*Id.*) He denied putting his penis near her vagina, but did indicate that he perhaps had placed it near her anus "while [he] was holding her down and tickling her." (*Id.*)

Petitioner M̶ also admitted that he had ejaculated one time while tickling his daughter. He told Corporal Wotring:

> While I was holding her down and tickling her, I got aroused. I sent her away. You know, I told her to get up and go feed the dogs or whatever I told her to do. By then it was just too late. . . . [T]hat is the only time I ever remember ejaculating when anything happened between us.

(*Id.*)

When asked how many times he believed the "sexual or tickling situations ha[d] occurred[,]" Petitioner M̶ responded:

> The sexual situations – we have talked about them four or five times. There has been three times that really stick in my mind and I woke up and we were in a compromising position and we talked about it. I believe her that there were two or three, four times that maybe it happened.

(*Id.*)

At trial, Michael M̶ exercised his right to testify and told the jury the following regarding his statement to Corporal Wotring:

> When he – when he first approached me and told me about my father having the gun he told me that if I would have told him something was going on that he could help me and put me in a protective custody because my father was going to kill me. We got into the cruiser. He read the Miranda Rights to me. He checked them off. And I signed the second part of the form waiving my rights to give the statement.

* * *

12

I thought the man was being truthful with me and wanted to help me. I figured he could put me in protective custody. He had even remarked that he needed to get me out of there for tonight. He asked me if I had anybody that I could call and I told him I wasn't going to call anybody at 2:00 in the morning, you know, to find a place to stay. And he says, well, I can put you in protective custody if you make a statement.

(Trial Tr. at 560.)

In response to his attorney's question whether the statement he gave Corporal Wotring was truthful, Petitioner M   said "As close as I could come, yeah." (*Id.*)[9]

Petitioner M   generally denied any sexual touching, but he did admit to the jury that there were times when he woke up and was told by his daughter that he had acted sexually inappropriate with her. (*See* Trial Tr. at 561-70.) He specifically told the jury the following:

When I woke up, me and my daughter were sitting on bean bag chairs in the living room. I pushed her off of me. I asked her what, you know, excuse me, but I asked her what the hell she thought she was doing. She told me that I had been playing with her and it overcame her and she sat on my chest.

(*Id.* at 561.)

He further told the jury that he had sometimes had difficulties getting erect, and that he was only able to remember being erect during one of the tickling incidents, and he could not "even say [he] was fully erect when she left the room." (*Id.* at 568.) Michael M   also testified that he suffered from migraine headaches. (*Id.* at 570.)

During cross-examination, Petitioner M   answered affirmatively to a question about whether at one point he had started to get aroused while tickling J.M. (Trial Tr. at 586.) He did not know whether the erection was due to what he was doing or whether it was his blood sugar. (*Id.*) He testified that he ejaculated about ten minutes after she left; he testified that he took care

---

[9] In response to the question on cross-examination regarding whether he lied during his statement to Corporal Wotring, he told the jury, "I told the truth as close as I could." (Trial Tr. at 581.)

of it himself while taking a bath and getting ready for work because the erection did not go away on its own. (*Id.* at 587.)

Prosecutor Brown's cross-examination centered largely on M   's statement to Corporal Wotring taken the night he was arrested. (*See* Trial Tr. at 577-629.) Mr. Brown read portions of the statement from the transcript, and then-Defendant M    explained the answers he gave to Corporal Wotring. (*See id.*) No objection was made to Mr. Brown's characterization of the statement. (*See id.*) The jury, however, had heard the audiotape recording of the statement during the State's case-in-chief. (Trial Tr. at 420-21.) The Court specifically refused to admit the transcript of the statement as evidence. (*Id.*)

During the cross-examination, Michael M    stated the following about his statement:

> I have tried to be truthful with Mr. Wotring and everybody since the day this happened. Okay. Now, I did not tell my wife what was going on. It happened on three occasions. I thought me and my daughter had settled it. I did not want any trouble in the house. Okay. I have talked to my wife since then. Many times. I am sorry and apologetic to her for not coming to her with what I thought J[.] was trying to do. I have never – I never initiated any sexual contact between me and my daughter. The red head that was here and testified, my wife, C is the second woman in my entire life that I have been sexual with. That's the way I was raised. That's the way I tried to raise my daughter. I understand this statement really don't sound good, but I did my best that night to explain to Corporal Wotring what was going on under the circumstances.

(*Id.* at 601.)

J.M., the victim, testified at trial. She testified that she had been the victim of her father's sexual assaults on six specific occasions, although she testified that the assaults had taken place approximately "fifteen to twenty" times overall. (Trial Tr. at 368.) J.M. recited six different sexual assaults with specificity.[10] (Trial Tr. at 349, 354, 355, 361-63, 364, and 365-

---

[10] One of the incidents J.M. testified to, which was designated as incident three in the Bill of Particulars, was actually two separate incidents. J.M. testified that Petitioner M    committed a sexual intrusion on her by placing his finger in her vagina while driving on Interstate 68 in Preston County. As part of that "incident," J.M. also testified that Petitioner M    placed his finger in her vagina again when they arrived at the Walmart parking lot in

14

66.) During direct examination, J.M. told the jury that she had denied the sexual assaults/abuse to a guidance counselor who had asked her about it because she was afraid her mother and father would get into a fight after the disclosure. (*Id.* at 369-70.)

Then-defendant M⸺ called Stephanie Newhart as a witness during his case-in-chief. Ms. Newhart's purpose was purportedly to testify about J.M.'s denial to her that Michael M⸺ had touched her in a sexual manner. (Trial Tr. at 634 (proffer by counsel for Defendant).) The Court ruled that counsel for Defendant had not, pursuant to Rule 613 of the West Virginia Rules of Evidence, laid a proper foundation for the introduction of extrinsic evidence to prove a prior inconsistent statement. (*Id.* at 634-35.) Defense counsel indicated that he had asked her whether she had ever told anybody that this had not happened, and that J.M. had answered no. (*Id.* at 634.) After a review of the transcript of J.M.'s cross-examination, this Court finds that counsel for Defendant did not ask that question; nevertheless, on direct examination, she explained to the jury why she had initially denied the allegations when questioned by a guidance counselor.

At the conclusion of the State's case-in-chief, the Court granted in part and denied in part then-defendant M⸺'s motion for judgment of acquittal. The Court found that J.M. testified with specificity to five incidents that occurred in Preston County. Of those five incidents, J.M.'s testimony established she was over the age of 12 for at least three of them, and one of the incidents did not involve sexual intercourse or sexual intrusion, as those terms are defined by statute; thus, the evidence supported sending only one charge of sexual assault in the

---

Monongalia County. Thus, incident three actually involved two separate sexual intrusions. The Court admitted the testimony regarding the Monongalia County sexual intrusion as a collateral act under *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990); however, the Court did not send the Monongalia County incident to the jury because the testimony did not establish that it was a continuous act of sexual intrusion. The Court did, however, send the sexual intrusion on Interstate 68 in Preston County to the jury for its consideration on a count of sexual abuse by a custodian. (*See* Trial Tr. 456-58.)

15

first degree to the jury.[11] All five incidents supported sending five counts of sexual abuse by a parent, guardian, or custodian to the jury. (*See* Trial Tr. at 454-61.) The Court further found that of those incidents, J.M.'s testimony established that one of the sexual abuse by a parent charges was committed before the 1998 amendment to West Virginia Code § 61-8D-5. (*Id.* at 455.) Therefore, the Court sent Counts 1, 11, 12, 13, 14, and 15 to the jury. The jury returned a guilty verdict on each charge. In special interrogatories, the jury found that Michael M had committed Count 11 before the amendment to West Virginia Code § 61-8D-5, and that he committed Count 12 after the amendment.

Michael M , through counsel Randy Goodrich, filed a motion for judgment of acquittal and a motion for a new trial. At the October 22, 2001 hearing, attorney Goodrich argued that Corporal Wotring had misled the grand jury by representing that these incidents had occurred "a couple of hundred times or more" despite the fact that when the evidence was ultimately produced, only five incidents could be established with any kind of specificity. (Trial Tr. at 710-11.) He further argued that the evidence seized from Motto's home should have been suppressed on the grounds that C M had merely acquiesced to law enforcement's demand to search. (*Id.* at 711-12.) Mr. M also argued that the Court had erred by not suppressing the recorded statement on the basis that he was promised protection from his father if he made the statement. (*Id.* 713-16.)

Mr. M further argued in his motion for a new trial that the Court's refusal of a continuance after his failed plea attempt was in error. The plea attempt occurred after the jury had been selected and opening statements had been made, and the Court found at that time it

---

[11] *See* Syl. pt. 8, *State ex rel. Morgan v. Trent*, 195 W. Va. 257, 465 S.E.2d 257 (1995) ("The language of W.Va. Code, 61-8B-3(a)(2) (1991), that identifies the victim of sexual assault in the first degree as a person 'who is eleven years old or less' applies to a person who is eleven years old, but who has not reached his or her twelfth birthday.").

16

was not being made voluntarily.[12] Defendant M        represented to the Court during the failed plea attempt that he had never suffered from a mental illness, but that he was being seen by a doctor after he had attempted to hang himself after his arrest. (Trial Tr. at 280.) He further testified that he was able to think clearly and that he understood everything that was happening. (*Id.*)

Defendant M        told the Court that "unless the court would grant a continuance in the case," he did not "see any other choice" but to accept the plea agreement. (*Id.* at 312.) Defendant M        wanted time for his daughter to have a mental examination and for someone to "look into the grand jury transcript." (*Id.*) Attorney Goodrich represented that he and Mr. M        had a "difference of opinion about" the grand jury issue. (*Id.* at 313-14.) Despite that, attorney Goodrich made a motion for a continuance on behalf of Mr. M        (*Id.* at 314.) The Court denied the motion because the case had been scheduled for quite some time, and it had previously been continued for the defense to prepare; further, the Court found it was not obligated to grant a motion for a mental examination of an alleged child victim absent a showing of substantial need or a compelling reason.[13] (*Id.* at 315.) Further, the Court reasoned that Mr. M        already had the grand jury transcript, so no continuance was necessary for that reason. (*Id.*)

Next, at the hearing on the motion for a new trial conducted on October 22, 2001, attorney Goodrich also asked the Court to grant Mr. M        a new trial on the ground that the Court erred by allowing evidence of other bad acts – specifically the sexual intrusion committed by Mr. M        upon his daughter in his truck outside the Walmart in Monongalia County –

---

[12] The terms of the plea agreement would have required Mr. M        to plead guilty to one count of sexual abuse by a parent, guardian, or custodian, in exchange for the State's dismissal of the remaining 19 counts.
[13] *See* Syl. pt. 3, *State v. Delaney*, 187 W. Va. 212, 417 S.E.2d 903 (1992).

17

without conducting a hearing pursuant to *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994). (Trial Tr. at 720.)

As his thirteenth assignment of error in support of his motion for a new trial, Defendant M contended that the Court erred by refusing to allow him to introduce the testimony of Stephanie Newhart to the effect that J.M. told her that he had never touched her in any sexual manner. (*Id.* at 729.)

At the conclusion of the hearing, the Court denied the motions filed by attorney Goodrich. Thereafter, the Court heard Michael M 's allocution, during which he essentially argued that he was innocent by pointing out inconsistencies with J.M.'s testimony and Corporal Wotring's grand jury testimony. (*Id.* at 750-69.)

The Court concluded at that time, on the record, that Mr. M 's complaint regarded factual inconsistencies that the legal system empanels a jury to decide. (*See id.* at 769-70.) The Court sentenced Mr. M to the following: Count 1, 15 to 35 years; Count 12, ten to 20 years, to run concurrent to Count 1; Count 11, five to 15 years, to run concurrent to Count 1; Count 14, ten to 20 years, to run concurrent to Count 1; and Count 15, ten to 20 years, to run consecutive to Count 1. Thus, Mr. M is currently serving an effective 25 to 55 year sentence for sexually abusing his daughter. The Court ordered this sentence because Mr. M had not taken any responsibility for the crime, and continued, even during his allocution, to blame his daughter for his conduct. (*Id.* at 772.)

The Court also granted attorney Goodrich's motion to withdraw as counsel. As the basis for that request, attorney Goodrich represented that Mr. M had filed a *pro se* letter to the Court in which he alleged ineffective assistance of counsel. The riff between counsel and Mr. M appeared at that time to relate to the grand jury testimony of Corporal Wotring and

18

counsel's decision to not use it to impeach Corporal Wotring during the trial. (*See id.* at 758.) For purposes of appeal and post-conviction matters, the Court appointed attorney James Flanigan to represent Mr. M⬛ by Order Substituting Counsel on October 24, 2001.

Attorney Flanigan filed a Motion for Reduction of Sentence on behalf of Mr. M⬛ Mr. Flanigan also filed a Notice of Intent to Appeal in the Supreme Court of Appeals of West Virginia. On October 30, 2002, the Supreme Court of Appeals refused the petition for appeal.

A hearing was conducted in the Circuit Court of Preston County on January 16, 2003, on Mr. M⬛'s Motion for Reconsideration. Prior to the hearing on the Motion for Reconsideration, attorney Flanigan filed a Motion for Psychological Evaluation on behalf of Mr. M⬛ in which he contended that Mr. M⬛ suffered from nerve damage to the right optical nerve from an automobile accident that occurred in 1992. According to the motion, the nerve damage caused Mr. M⬛ severe headaches that resulted in occasional irrational behavior. According to Mr. M⬛, the combination of his depression and the constant headaches "may have been a prominent factor in his behavior during the time in question . . . ." (Def.'s Mot. for Alternative Sentencing, Summary Attachment at 2.)

At the beginning of the January 16, 2003 hearing, Mr. M⬛ withdrew his Motion for Psychological Evaluation. Instead, Mr. M⬛ made a more candid and detailed admission as to his guilt and accepted responsibility for his actions. The Court, for the reasons set forth at Mr. M⬛'s sentencing, denied his Motion for Reconsideration.

On April 5, 2004, Petitioner M⬛ filed a *pro se* Motion for the Appointment of Counsel. Mr. M⬛ requested that the Court appoint counsel for him to prepare a petition for writ of habeas corpus. By Order Substituting Counsel entered April 8, 2004, this Court appointed attorney Wiley Newbold to represent Mr. M⬛.

19

On December 2, 2015, Petitioner M       by counsel Wiley Newbold, filed a Petition for Writ of Habeas Corpus in Case No. 15-C-188. On December 22, 2015, Petitioner filed a "Checklist of Grounds of Post-Conviction Habeas Corpus Relief." Petitioner affirmatively waived all grounds but the following:

1) Mental competency at time of crime;
2) Mental competency at the time of trial, cognizable even if not asserted at proper time or if resolution not adequate;
3) Coerced confessions;
4) State's knowing use of perjured testimony;
5) Ineffective assistance of counsel;
6) Irregularities in arrest;
7) No preliminary hearing;
8) Defects in indictment;
9) Refusal of continuance;
10) Claims of prejudicial statements by prosecutor;
11) Improper communications between prosecutor or witness and jury.

(*See* Checklist of Grounds of Post-Conviction Habeas Corpus Relief, Dec. 22, 2015, Case No. 15-C-188.)

In his December 2, 2015 Memorandum of Law in Support of Petition for Writ of Habeas Corpus, Petitioner M       contends he is being imprisoned in violation of his constitutional rights for the following reasons:

1) Ineffective Assistance of Counsel
   a. improper questioning of the State's primary witness, which prevented the introduction of otherwise admissible impeachment evidence;
   b. failed to investigate possible defenses available to Mr. M       , specifically that he was suffering from an untreated psychological illness at the time of the crimes;
   c. failed to object or move for a mistrial when the State introduced and the Court admitted evidence subject to Rule 404(b) without proper notice and without a *McGinnis* hearing;
   d. failed to impeach Corporal Wotring's trial testimony with his prior inconsistent sworn statements before the grand jury
2) Indictment was Defective
3) Willfully Fraudulent Testimony by Corporal Wotring Before the Grand Jury
4) Prosecutor Improperly Read a Transcript That Had Been Deemed Inadmissible When Cross-Examining Witnesses
5) Trial Court Improperly Denied Request for Continuance

20

6) Trial Court Erred by Admitting the State's Inadmissible Evidence
   a. Petitioner's statement was involuntarily given;
   b. erroneous admission of illegally seized evidence taken from Petitioner's home without consent;
7) Biased Presentence Report
8) Cumulative Effect of All Errors

(*See* Pet'r's Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus.)

This Court conducted a scheduling conference on December 22, 2015, at which time the Court scheduled an omnibus hearing to be conducted on June 3, 2016. The State agreed to file an answer by January 22, 2016.

On June 3, 2016, the Court conducted the omnibus hearing. Attorney Newbold initially made a motion for default judgment because the Respondent Warden had not filed an answer. This Court denied the motion for default judgment on the basis that default judgment was inappropriate because Mr. M      is being incarcerated on an as-to-date valid conviction from Case No. 00-F-71.

Petitioner called two witnesses during the omnibus hearing: Kenneth Wotring and Randy Goodrich. Respondent Warden did not call any witness or introduce any evidence. To the extent that their testimony is pertinent to the legal analysis, the Court will discuss that evidence *infra*.

At the conclusion of the hearing, the Court took the matter under advisement and ordered Petitioner to file his proposed findings of fact and conclusions of law by August 5, 2016. The Court further ordered that the Respondent Warden filed his proposed findings of fact and conclusions of law by August 19, 2016. On August 5, 2016, Petitioner filed his Proposed Findings of Fact and Conclusions of Law. Respondent Warden did not file any proposed findings of fact and conclusions of law. The Court notes, however, that on June 6, 2016, the Warden did finally file an answer in which he generally denies all grounds asserted by

21

Petitioner M          Specifically, Respondent contends that all grounds except ineffective assistance of counsel were fully and fairly litigated at trial and on appeal.[14] (*See* Resp't's Answer to Pet. for Writ of Habeas Corpus.)

## STANDARD OF REVIEW

West Virginia Code § 53-4A-1 states in part that

> [a]ny person convicted of a crime and incarcerated under sentence of imprisonment therefor who contends that there was such a denial or infringement of his rights as to render the conviction or sentence void under the Constitution of the United States or the Constitution of this State, or both, or that the court was without jurisdiction to impose the sentence, or that the sentence exceeds the maximum authorized by law, or that the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under the common law or any statutory provision of this State, may, without paying a filing fee, file a petition for a writ of habeas corpus ad subjiciendum, and prosecute the same, seeking release from such illegal imprisonment, correction of the sentence, the setting aside of the plea, conviction and sentence, or other relief, if and only if such contention or contentions and the grounds in fact or law relied upon in support thereof have not been previously and finally adjudicated or waived in the proceedings which resulted in the conviction and sentence, or in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article, or in any other proceeding or proceedings which the petitioner has instituted to secure relief from such conviction or sentence.

W. Va. Code Ann. § 53-4A-1(a) (LexisNexis 2008) (in part). Following the evidentiary hearing, the Court must do the following:

---

[14] "Th[e Supreme Court of Appeals of West Virginia]'s rejection of a petition for appeal is not a decision on the merits precluding all future consideration of the issues raised therein, unless, as stated in Rule 7 of the West Virginia Rules of Appellate Procedure, such petition is rejected because the lower court's judgment or order is plainly right, in which case no other petition for appeal shall be permitted." Syl. pt., *Smith v. Hedrick*, 181 W. Va. 394, 382 S.E.2d 588 (1989). The Supreme Court's order stated only that "[u]pon consideration whereof, the Court is of opinion to and doth hereby refuse said petition for appeal." (Order of Supreme Court of Appeals of West Virginia, Oct. 30, 2002.) This Court further notes that Petitioner M    s Petition for Appeal was filed before the revised Rules of Appellate Procedure took effect on December 1, 2010, which now require the Supreme Court to enter a written opinion on the merits in every case. *See* W. Va. R. App. P. 21, Clerk's comments ("These changes reinforce the fact that every appeal will receive a decision on the merits that sets forth the considered judgment of the Court."). Because the denial of the appeal may or may not have constituted a decision on the merits, this Court believes the better course of action is to consider Petitioner's arguments even if they were included in his Petition for Appeal. Accordingly, this Court will address all of Petitioner's grounds as set forth in his *Losh* list, to the extent that he has developed those grounds.

The court shall draft a comprehensive order including: (1) findings as to whether a state and/or federal right was presented in each ground raised in the petition; (2) findings of fact and conclusions of law addressing each ground raised in the petition; (3) specific findings as to whether the petitioner was advised concerning his obligation to raise all grounds for post conviction relief in one proceeding; and (4) if the petitioner appeared pro se, specific findings as to whether the petitioner knowingly and intelligently waived his right to counsel.

Rules Governing Post-Conviction Habeas Corpus Proceedings 9(c).

Finally, the Petitioner bears the burden of proving the allegations contained in the petition that warrant his release by a preponderance of the evidence. *State ex rel. Scott v. Boles*, 150 W. Va. 453, 456, 147 S.E.2d 486, 489 (1966).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

I. **Petitioner M___ has been represented by counsel throughout the entirety of these habeas corpus proceedings, and the Court has advised petitioner of his obligation to raise all grounds for post-conviction relief in one proceeding.**

The Court finds that Petitioner M___ was advised concerning his obligation to raise all grounds for post-conviction relief in one proceeding. The Court appointed attorney Wiley Newbold, at the request of Petitioner M___ by Order Substituting Counsel on April 8, 2004, in Case No. 00-F-71. The Petition for Writ of Habeas Corpus was filed by counsel Wiley Newbold. This case did not begin with a *pro se* petition.

Further, Petitioner M___ filed a *Losh* checklist by counsel Wiley Newbold, which unequivocally states that grounds check will be deemed waived. Petitioner M___ affirmatively placed his initials on the grounds he wished to waive. At the December 22, 2015 scheduling conference, counsel for Petitioner told the Court that he had gone over the *Losh* checklist with Mr. M___ and that he believed he understood that anything waived could not be raised later. (Sched. Conf. Hr'g Tr. 3, Dec. 22, 2015.)

23

Accordingly, this Court finds and concludes that Petitioner M        has been represented by counsel throughout this habeas corpus proceeding. The Court further finds and concludes that Petitioner M        was advised concerning his obligation to raise all grounds for post-conviction relief in one proceeding.

**II.     Petitioner has failed to prove by a preponderance of the evidence the allegations contained in his Memorandum of Law in Support of Petition for Writ of Habeas Corpus.**

### A. Ineffective Assistance of Counsel

Petitioner contends that this Court should grant his Petition for Writ of Habeas Corpus on the basis that he received ineffective assistance of his trial counsel for four reasons.[15] The Court will consider each ground separately. First, the Court considers the appropriate standard of review for claims of ineffective assistance of counsel.

The right to the effective assistance of counsel is guaranteed by the Sixth Amendment to the United States Constitution, *see Strickland v. Washington*, 466 U.S. 668, 688 (1984) (effective assistance of counsel "relies . . . on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the [Sixth] Amendment envisions"), and that right "is made obligatory upon the states by virtue of the due process clause of the Fourteenth Amendment." Syl. pt. 1, *State ex rel. May v. Boles*, 149 W. Va. 155, 139 S.E.2d 177 (1964).

The law in West Virginia regarding ineffective assistance of counsel requires the application of the two-pronged test as announced by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668 (1984) and by the State Supreme Court in *State v. Miller*, 194 W. Va. 3, 15, 459 S.E.2d 114, 126 (1995).

---

[15] Petitioner M        's allegations are in regard only to his trial counsel.

24

*Strickland* requires the defendant to prove two things: (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." When assessing whether counsel's performance was deficient, [a court] "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" To demonstrate prejudice, a defendant must prove there is a "reasonable probability" that, absent the errors, the jury would have reached a different result.

*State v. Miller*, 194 W. Va. 3, 15, 459 S.E.2d 114, 126 (1995) (internal citations omitted). The

*Miller* Court, by Justice Cleckley, cautioned courts from judging counsel's performance through

hindsight, 194 W. Va. at 17, 459 S.E.2d at 128, and instead urged courts to ask "whether a

reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the

case at issue." 194 W. Va. at 16, 459 S.E.2d at 127.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court of the United

States stated that

[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland v. Washington*, 466 U.S. 668, 689-90 (1984) (citations omitted).

"Under these rules and presumptions, the cases in which a defendant may prevail on the

ground of ineffective assistance of counsel are few and far between one another. This result is

no accident, but instead flows from deliberate policy decisions . . . ." *State v. Miller*, 194 W.

Va. 3, 16, 459 S.E.2d 114, 127 (1995). "In other words, we always should presume strongly

that counsel's performance was reasonable and adequate." *Id.* The goal is not to "grad[e]

25

lawyers' performances[,]" but instead to see "whether the adversarial process at the time, in fact, worked." *Id.*

Finally, the Petitioner bears the burden of proving the allegations contained in the petition that warrant his release by a preponderance of the evidence. *State ex rel. Scott v. Boles,* 150 W. Va. 453, 456, 147 S.E.2d 486, 489 (1966).

Accordingly, with the highly deferential standard of review for ineffective assistance of counsel claims in mind, this Court considers Petitioner's assertions.

### i. Alleged improper questioning of the State's primary witness, which prevented the introduction of otherwise admissible impeachment evidence

Petitioner M        contends that trial attorney Randy Goodrich was ineffective by failing to properly set up an impeachment of J.M., which allegedly would have provided evidence to the jury that J.M. told Stephanie Newhart that her father had never touched her. (*See* Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus at 16-19.) After considering the Petition, the official record, the evidence presented at the omnibus hearing, and the pertinent legal authorities, the Court finds and concludes that this ground is without merit because the jury had already heard that J.M. had made inconsistent statements regarding the sexual abuse and chose to believe her. A reasonable probability does not exist that the results would have been different.

At trial, attorney Goodrich did not ask J.M. during his cross-examination of her whether she had ever talked to Stephanie Newhart about the sexual abuse at all. (*See* Trial Tr. at 375-92.) Nevertheless, during Mr. M        s case-in-chief, attorney Goodrich called Stephanie Newhart as a witness to purportedly introduce extrinsic evidence of a prior inconsistent statement allegedly made by J.M. Ms. Newhart testified that she had been a friend to Mr. M

26

for approximately eight years. C     M    , J.M., and J.M.'s two sisters went to live with Ms. Newhart's family in Pennsylvania after Petitioner had been charged with the sexual abuse of J.M. Attorney Goodrich asked Ms. Newhart the following: "Did there come a time when you and J     had any kind of conversation about these alleged incidents?" (*Id.* at 633.) The State immediately objected on the basis of hearsay. (*Id.*)

A bench conference was conducted, during which attorney Goodrich represented to the Court that Ms. Newhart had told him that "in one of the conversations she contends and tells me that J[.M.] stated that her dad had never touched her in a sexual manner and she never thought he would . . . . It goes to the credibility of J[.M.] . . . ." (*Id.* at 634.) The State argued that "if he intended to introduce a prior inconsistent statement, he would have been required to ask [the victim] if she had ever made that statement to this witness, and if she said no then he could impeach her through this witness. Mr. Goodrich did not do that." (*Id.*)

The Court sustained the objection after concluding that "Rule 613 says extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same, and the opposing party is afforded an opportunity to interrogate the witness thereon or the interests of justice otherwise require." (*Id.* at 635.) Because attorney Goodrich had not specifically asked J.M. about the purported statement, the Court concluded that Ms. Newhart's anticipated testimony was not a proper manner of impeaching J.M. with a prior inconsistent statement. (*Id.*)

Now, Petitioner M     contends that attorney Goodrich was ineffective by failing to properly set up this impeachment evidence. During the June 3, 2016 omnibus hearing, Petitioner M  introduced as Petitioner's Exhibit 5 a handwritten affidavit from Stephanie Newhart, dated August 16, 2001, and notarized on October 20, 2001, in which Ms. Newhart

27

states that J.M. told her on July 31, 2001 (approximately one week prior to the trial) that her father had never touched her but that she was not changing her story now. (*See* Pet'r's Ex. 5.)

Rule 613 of the West Virginia Rules of Evidence in 2001[16] stated that

> [e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).

W. Va. R. Evid. 613(b) (1994).

> Three requirements must be satisfied before admission at trial of a prior inconsistent statement allegedly made by a witness: (1) The statement actually must be inconsistent, but there is no requirement that the statement be diametrically opposed; (2) if the statement comes in the form of extrinsic evidence as opposed to oral cross-examination of the witness to be impeached, the area of impeachment must pertain to a matter of sufficient relevancy and the explicit requirements of Rule 613(b) of the West Virginia Rules of Evidence— notice and an opportunity to explain or deny—must be met; and, finally, (3) the jury must be instructed that the evidence is admissible only to impeach the witness and not as evidence of a material fact.

Syl. pt. 1, *State v. Blake,* 197 W.Va. 700, 478 S.E.2d 550 (1996); Syl. pt. 8, *State v. Rodoussakis,* 204 W. Va. 58, 511 S.E.2d 469 (1998).

In *State v. Rodoussakis,* 204 W. Va. 58, 511 S.E.2d 469 (1998), the trial court prohibited the introduction of an audiotape containing a prior inconsistent statement of a witness. The Supreme Court of Appeals reasoned:

> A review of the record reveals that one of the grounds for the trial court's exclusion of the audiotape was that Poole, at the time of her cross-examination, was never informed of the existence of the audiotape, and, therefore, never had an opportunity to respond to it. We agree with the trial court. Rule 613(b) clearly provides, in part, that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible *unless the witness is afforded an opportunity to explain or deny the same.*" Because Poole was not made aware of the existence of the audiotape, she had no opportunity to explain its contents. As the trial court suggested, Poole might have made any of several plausible explanations for the audiotape's existence including an assertion that the audiotape was a fabrication.

---

[16] The West Virginia Rules of Evidence were amended in 2014.

She may have denied that it was her voice on the audiotape. However, because the defendant did not disclose the existence of the audiotape until the day after Poole testified, she would not have had the opportunity to offer any of these explanations. This is contrary to the requirement of Rule 613(b).

*Rodoussakis*, 204 W. Va. at 75-76, 511 S.E.2d at 486-87.

Thus, this Court finds and concludes that because J.M. was not given an opportunity to explain or deny the alleged prior inconsistent statement to Stephanie Newhart, Petitioner M was properly prohibited from introducing the statement as impeachment evidence through the testimony of Ms. Newhart during his case-in-chief. Thus, the question is whether that failure by trial counsel to provide that opportunity constituted ineffective assistance of counsel.

Assuming *arguendo* that counsel's failure to properly set up the impeachment constituted a deficient performance, the Court finds and concludes that there is not a reasonable probability that the results of the proceedings would have been different.[17] *See State v. Miller*, 194 W. Va. 3, 15, 459 S.E.2d 114, 126 (1995). In this case, the jury had already heard during J.M.'s direct examination by the State that she had denied the sexual abuse to a guidance counselor at her school. J.M. explained the inconsistent statement the following way:

> I denied it that day because my father and my mother were both home, and my dad had to go to work and Kim was going to call my mom right then and there and tell her that something was happening if I confessed up to it, and the reason I said no is because if she would have called my mom then my mom and my dad would have probably gotten into a fight.

(Trial Tr. at 370.) Thus, the jury was aware that J.M. had made a prior inconsistent statement – in fact, an outright denial of the sexual abuse – and the jury still chose to believe her testimony as evidenced by the jury finding Petitioner M guilty on every count sent to the jury.

---

[17] *See* Syl. pt. 5, *State ex rel. Daniel v. Legursky*, 195 W. VA. 314, 465 S.E.2d 416 (1995) (holding that court may dispose of an ineffective assistance claim "based solely on a petitioner's failure to meet either prong" of the *Strickland/Miller* test).

Second, in combination with the jury's knowledge of J.M.'s explanation for making the prior denial, the jury heard Petitioner M___ s statement to Corporal Wotring during which he admitted to engaging in acts of "tickling" with his daughter, during which he stated he was always naked and that she had been naked a couple of times. During one of these "tickling" incidents, Petitioner M___ told Corporal Wotring that he ejaculated. He further told Corporal Wotring that he had awoken three times and found himself in a compromising (i.e. sexual) position with his daughter.

This Court finds and concludes that even if the jury had heard that J.M. had made an inconsistent statement to Ms. Newhart, a reasonable probability does not exist that the outcome of his trial would have been different. As in *Rodoussakis*, J.M. may have had any number of plausible explanations – as she did with the denial to the guidance counselor. Any impact the alleged statement to Ms. Newhart may have had on the jury is purely speculative, and combined with Mr. M___ s implausible and incriminating statement to Corporal Wotring, the Court finds and concludes that the outcome of the trial would not likely have been different had attorney Goodrich been able to introduce Ms. Newhart's testimony. For that reason, the Court finds and concludes this ground is without merit.

### ii. Alleged failure of trial counsel to investigate possible defenses available to Mr. M___ specifically that he was suffering from an untreated psychological illness at the time of the crimes

In his Petition for Writ of Habeas Corpus, Mr. M___ contends that trial counsel's performance was deficient in that he failed to investigate Mr. M___ s "untreated mental illness" that caused him "significant problems such as headaches, irritability, and mood swings." (Mem. of Law in Support of Pet. for Writ of Habeas Corpus at 20.) Petitioner contends that "[a]

30

psychological evaluation of Mr. Motto *might* have shown that he was of diminished capacity at the time of the alleged incidences." (*Id.*)

In the official court file in Case No. 00-F-71, appellate counsel for Mr. M̶ filed (after the Supreme Court of Appeals refused his Petition for Appeal) a Motion for Psychological Evaluation, in which Mr. M̶ alleged that he suffered from nerve damage to the right optical nerve due to a 1992 car accident. Without nerve-block injections, according to Mr. M̶ 's motion, he suffered from severe headaches and occasionally acted irrationally. (*See* Mot. for Psychological Evaluation, ¶ 1, Case No. 00-F-71.) Further, Mr. M̶ contended that he had been diagnosed with chronic depression and was prescribed Paxil on a daily basis. (*Id.* at ¶ 6.) That motion was later withdrawn by appellate counsel on January 16, 2003.

Petitioner M̶ has failed to further develop the allegation that his counsel was either ineffective or that the outcome of the trial would have been different. While this Court agrees that "[t]he fulcrum for any ineffective assistance of counsel claim is the adequacy of counsel's investigation[,]" Syl. pt. 3, in part, *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 465 S.E.2d 416 (1995), Petitioner has simply failed to show that counsel failed to either investigate Mr. M̶ s *alleged* mental deficiencies, or that such investigation would have led the jury to find diminished capacity and thus effecting the outcome of the trial. Whether Mr. M̶ suffered from a mental disease or defect that rendered him incapable, at the time he sexually abused his daughter, of forming the particular mental state required, is purely speculative; and even in hindsight, Petitioner has failed to introduce any evidence to show by a preponderance of the evidence that his alleged optical nerve damage caused him to commit sexual intrusions on his daughter. *See* Syl. pt. 3, *State v. Joseph*, 214 W. Va. 525, 590 S.E.2d 718 (2003) (establishing that the "diminished capacity defense is available in West Virginia to permit a defendant to

31

introduce expert testimony regarding a mental disease or defect that rendered the defendant incapable, at the time the crime was committed, of forming a mental state that is an element of the crime charged").[18]

For those reasons, the Court finds and concludes that the allegations contained in this ground are mere speculation, and thus therefore finds and concludes that Petitioner M‌ has not proven this ineffective assistance of counsel claim by a preponderance of the evidence.

### iii. Alleged failure to object or move for a mistrial when the State introduced and the Court admitted evidence subject to Rule 404(b) without proper notice and without a *McGinnis* hearing

Petitioner M‌ contends in his Memorandum of Law in Support of Petition for Writ of Habeas Corpus that his trial counsel was ineffective by failing to object or move for a mistrial when the State introduced, and the Court admitted, evidence subject to Rule 404(b) without proper notice and without a *McGinnis* hearing.[19] This Court finds, as a matter of law, that whether Petitioner's trial counsel objected or moved for a mistrial would not have affected the outcome because the evidence was not subject to either Rule 404(b) or *McGinnis*.

At issue in this assignment is the State's questioning of J.M. regarding an incident in his truck between Petitioner and J.M. on the interstate between their home in northern Preston County and Morgantown, West Virginia (in Monongalia County, West Virginia, and thus outside the jurisdiction of the Circuit Court of Preston County). J.M. testified that she went with her father on a shopping trip to Walmart, which required them (at that time) to go to Morgantown, West Virginia. She testified at trial:

---

[18] The Court would further note that neither sexual assault in the first degree under West Virginia Code § 61-8B-3 (1991) nor sexual abuse by a custodian under West Virginia Code § 61-8D-5 (1991) required any particular mental state as an element of the crime. With that in mind, the Court is unsure what, if any, impact a diminished capacity defense could have on either crime, and Petitioner M‌ has not otherwise attempted to demonstrate to the Court how a diminished capacity defense – if one was even available to him, which is highly speculative – would have impacted the outcome of his particular trial. "Diminished capacity simply does not apply when the crime charged does not require proof of a specific intent or mental state." *State v. Swagerty*, 810 P.2d 1, 2 (Wash. Ct. App. 1991).

[19] *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994).

32

[W]e got in the truck and went to Morgantown. At the time I had a headache, and I felt a little bit nauseated so at the end of our road heading off toward Prison Road I didn't feel that comfortable plus I had a headache and didn't feel good. So he asked me to lay down on the seat. I laid down on the seat and the assault started once we were on the interstate going to Morgantown. Then at that time he asked me to put my head on his leg or close to it. Then he inserted his finger in my vagina again.

(Trial Tr. 356.)

J.M. further testified that he began inserting his finger into her vagina on the "exit right outside of Bruceton Mills." (*Id.*)

When J.M. began to testify about what happened when they got to the Walmart in Morgantown, trial attorney Goodrich did object on the ground that this testimony involved actions committed outside the jurisdiction of the Court, and the Court then held a bench conference outside the hearing of the jury. (*Id.* at 357.) The Court ruled that pursuant to *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990), the alleged acts in Monongalia County were interwoven with the allegations in Preston County, and that they were evidence of the lustful disposition of Mr. M       towards the victim. (Trial Tr. 358.)

Upon consideration of Mr. M       's allegations in his current petition for writ of habeas corpus, the Court finds and concludes that he has not proven ineffective assistance of counsel based on the alleged failure to object to this testimony by a preponderance of the evidence. The trial transcript clearly and unequivocally shows that attorney Goodrich did object on the basis that the sexual intrusion occurred in Monongalia County, and thus outside the territorial jurisdiction of this Court.

Second, even if attorney Goodrich had not objected, the Court finds that the outcome would be the same. The testimony regarding the acts – even if isolated to the sexual intrusion

33

of J.M. in the Walmart parking lot in Monongalia County -- was not subject to a Rule 404(b) analysis.

Rule 404(b) of the West Virginia Rules of Evidence stated, in 2001, that

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

W. Va. R. Evid. 404(b) (1994).

However, not all uncharged conduct is subject to a Rule 404(b) analysis.

One of the accepted bases for the admissibility of evidence of other crimes arises when such evidence "furnishes part of the context of the crime" or is necessary to a "full presentation" of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its "environment" that its proof is appropriate in order "to complete the story of the crime on trial by proving its immediate context or the 'res gestae' " or the "uncharged offense is 'so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other ...' (and is thus) part of the res gestae of the crime charged." And where evidence is admissible to provide this "full presentation" of the offense, "(t)here is no reason to fragmentize the event under inquiry" by suppressing parts of the "res gestae." As the Court said in *United States v. Roberts,* 548 F.2d 665, 667 (6th Cir.1977), ... "(t)he jury is entitled to know the 'setting' of a case. It cannot be expected to make its decision in a void without knowledge of the time, place and circumstances of the acts which form the basis of the charge."

*State v. Harris,* 230 W. Va. 717, 721-22, 742 S.E.2d 133, 137-38 (2013) (per curiam) (quoting

*United States v. Masters,* 622 F.2d 83, 86 (4th Cir. 1980)).

The inquiry regarding intrinsic evidence is succinctly stated in *The Handbook on Evidence for West Virginia Lawyers*:

Other bad act evidence is intrinsic and admissible if it is (1) an uncharged offense which arose out of the same transaction or series of transactions as the

34

charged offense, (2) inextricably intertwined with the evidence regarding the charged offense, or (3) necessary to complete the story of the crime.

Louis J. Palmer, Jr., et al., *Handbook on Evidence for West Virginia Lawyers*, § 404.05[5][a] (6th ed. 2015).

The Court finds and concludes first that the Petitioner's commission of sexual intrusion upon his daughter on Interstate 68 and in the Walmart parking lot in Monongalia County was intrinsic, and thus it was not subject to Rule 404(b) or *McGinnis*. The sexual intrusion, based on J.M.'s testimony, started in Preston County and perhaps continued into Monongalia County, and therefore the sexual intrusion in Monongalia County arose out of the same transaction as the charged offense. Second, because the sexual intrusions that began in Preston County on Interstate 68 and occurred again a short time later in the Walmart parking lot, it was inextricably intertwined with the evidence regarding the charged offense. The whole episode was a series of the same transaction – it would have been unreasonable for J.M. to have to stop testifying about the conduct simply because she and her father had crossed the border on Interstate 68 into Monongalia County.

Next, the Court finds that the admission of this evidence was also proper pursuant to *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). In *Edward Charles L.*, the Court held that

> [c]ollateral acts or crimes may be introduced in cases involving child sexual assault or sexual abuse victims to show the perpetrator had a lustful disposition towards the victim, a lustful disposition towards children generally, or a lustful disposition to specific other children provided such evidence relates to incidents reasonably close in time to the incident(s) giving rise to the indictment.

Syl. pt. 2, *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

Even if the Court had conducted a *McGinnis* hearing, it would have found that the evidence of Petitioner's commission of sexual intrusion upon his daughter in Monongalia

35

County was (1) intrinsic and admissible, and (2) admissible to show Petitioner M    's lustful disposition towards his daughter. Therefore, the alleged failure to conduct a *McGinnis* hearing would not have changed the outcome of the trial, because that evidence would still have been presented to the jury. Finally, the Court gave a limiting instruction after J.M.'s direct examination and in its charge to the jury cautioning the jury that any testimony regarding conduct not charged in the indictment was not proof of the charges contained in the indictment, but instead was offered for the limited purpose of showing intent and/or Petitioner's lustful disposition toward children. (Trial Tr. 373-74; Judge's Charge to the Jury at 22-23.)

For those reasons, the Court finds and concludes that Petitioner has failed to prove by a preponderance of the evidence that his counsel was ineffective for failing to object or requesting a *McGinnis* hearing regarding the evidence of Petitioner's sexual abuse of his daughter in Monongalia County.

### iv. Alleged failure to impeach Corporal Wotring's trial testimony with his prior inconsistent sworn statements before the Grand Jury

Petitioner contends in his Memorandum of Law in Support of Petition for Writ of Habeas Corpus that Petitioner's trial counsel was ineffective by failing to impeach Corporal Ken Wotring with prior inconsistent statements he made to the Grand Jury in addition to the testimony of others. (*See* Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus at 22-29.) Specifically, Petitioner contends that Corporal Wotring's testimony to the Grand Jury "appears to be made of whole cloth[,]" (*id.* at 27), and that trial counsel failed to impeach Corporal Wotring with his inconsistencies. Further, Petitioner contends that Corporal Wotring's testimony regarding Petitioner M    's father's actions on the night of his arrest was not adequately challenged at trial by counsel.

36

The Court finds that, assuming *arguendo* that trial counsel's failure to impeach Corporal Wotring with his prior grand jury testimony was unreasonable, Petitioner has failed to show that a reasonable probability exists the result of the trial would have been different if he had been impeached.

First, the Court notes that Corporal Wotring's testimony to the grand jury, which consists of three and a half double-spaced pages of substantive testimony, has some inaccuracies when compared to Michael M    's statement to Corporal Wotring. For instance, Corporal Wotring told the Grand Jury that M    "said that he performed oral sex on his daughter . . . at least I think five or six times . . . ." (Grand Jury Tr. 7.) In M    s statement to Corporal Wotring, when asked "how many times . . . the sexual or the tickling situations ha[d] occurred[,]" he stated, "[t]he tickling – probably a couple dozen or more. The sexual situations – we have talked about them four or five times. There has been three times that really stick in my mind and I woke up and we were in a compromising position and we talked about it." (M    's Statement Tr. at unnumbered 6.) Corporal Wotring also told the Grand Jury that J[.] told [him] that every [*sic*] since she was ten years old her father had been sexually assaulting her. He would always pretend that he was asleep in doing these things to her. . . . This happened two or three times a week until the present date." (Grand Jury Tr. 5-6.) The State sought and obtained a 20 count indictment from the Grand Jury. Nevertheless, all but six of the 20 counts were dismissed after the evidence presented by the State only supported five total incidents of sexual abuse with enough specificity to send them to the jury, and the bill of particulars provided by the State after interviewing J.M. before trial only showed five incidents of sexual abuse.

37

Petitioner argues generally that if Corporal Wotring's credibility had been impeached at trial, then his testimony regarding the circumstances surrounding the taking of Petitioner's statement on the night he was arrested would have been impacted. This Court finds that Petitioner has failed to prove that the outcome would have been different had this occurred.

At trial, Petitioner M     gave the following testimony:

Q:     What was your -- what did you think would happen if you gave this statement?
A:     I thought the man [Wotring] was being truthful with me and wanted to help me. I figured he could put me in protective custody. He had even remarked that he needed to get me out of there for tonight. He asked me if I had anybody that I could call and I told him I wasn't going to call anybody at 2:00 in the morning, you know, to find a place to stay. And he says, well, I can put you in protective custody if you make a statement.
Q:     So then did you make a statement?
A:     Yes, I did.
Q:     Was it a truthful statement?
A:     As close as I could come, yeah.

(Trial Tr. 560.)

Thus, assuming *arguendo* that Corporal Wotring had been untruthful with the Grand Jury, and assuming *arguendo* that he was untruthful about the circumstances regarding Mr. M    's statement, Petitioner testified to the jury that the statement he gave to Corporal Wotring was "as close as [he] could come" to being truthful.

Further, the petit jury that convicted Mr. M    saw the *Miranda* rights form signed by Mr. M    The jury also heard the statement he gave, at the beginning and conclusion of which he stated he gave it voluntarily and that he was not promised, intimidated, or threatened in any way. Simply put, even if Corporal Wotring's credibility had been diminished, the jury heard from Petitioner M    himself that he was not promised anything to make the statement, and that the statement itself was as true as he could make it. The Court finds and concludes that Petitioner M    has not shown by a preponderance of the evidence that a reasonable

38

probability exists that the outcome of the trial would have been different if trial counsel had attempted to impeach Corporal Wotring's credibility with his grand jury testimony.

For those reasons, the Court finds that this ground for relief is without merit.

### B. Indictment was Defective

Petitioner contends in his Memorandum of Law in Support of Petition for Writ of Habeas Corpus that the indictment in his case was defective because it "could not have placed the Defendant on fair notice of the charge for which he must defend without containing the date because the date was of the essence of the crime." (Mem. of Law in Supp. of Pet. for Writ of Prohibition at 30.) Petitioner contends that time was of the essence in this case to both put Petitioner on notice of what he was being charged with, and because the sexual abuse by a custodian statute he was charged under changed during the timeframe cited in the indictment, which change added additional incarceration time as a penalty.

The indictment in Case No. 00-F-71 contains ten counts of Sexual Assault in the First Degree under West Virginia Code § 61-8B-3, and ten counts of Sexual Abuse by a Custodian under West Virginia Code § 61-8D-5. The first ten counts of the indictment charging Mr. M     with Sexual Assault in the First Degree are identically worded:

> That between the ___ day of _____, 1997, and the 26th day of May 1999, in Preston County, West Virginia, Michael     M     committed the offense of "First Degree Sexual Assault" by unlawfully and feloniously subjecting J[.]M[.] to sexual intrusion or sexual intercourse, the said J[.]M[.] being eleven (11) years old or less, and the said Michael     M     being fourteen (14) years old or more, in violation of West Virginia Code § 61-8B-3, against the peace and dignity of the State.

(Indictment, Case No. 00-F-71, Counts 1-10.) J.M. testified at trial that her date of birth was May 26, 1987, thus she turned twelve years old on May 26, 1999. (*See* Trial Tr. 373.)

39

Similarly, counts 11 through 20 charging Michael M     with Sexual Abuse by a Custodian are identically worded:

> That between the ___ day of _____, 1997, and the 26th day of May 2000, in Preston County, West Virginia, Michael    M  committed the offense of "Sexual Abuse by a Custodian" by unlawfully and feloniously engaging in or attempting to engage in sexual intercourse or sexual contact with J[.]M[.], a child who was under his care, custody and control, in violation of West Virginia Code § 61-8D-5, against the peace and dignity of the State.

(Indictment, Case No. 00-F-71, Counts 11-20.)

West Virginia Code § 62-2-10 states, in pertinent part, that "[n]o indictment . . . shall be quashed or deemed invalid . . . for omitting to state, or stating imperfectly, the time at which the offense was committed, when time is not of the essence of the offense[.]" W. Va. Code Ann. § 62-2-10 (West 2016). In *State ex rel. Thompson v. Ballard*, 229 W. Va. 263, 728 S.E.2d 147 (2012) (per curiam), the Supreme Court of Appeals of West Virginia held on an appeal of the denial of a petition for writ of habeas corpus after the petitioner was convicted of sexual abuse in the first degree and sexual abuse by a parent, guardian, or custodian that "time is not an element of the offenses with which the appellant was charged." *Thompson*, 229 W. Va. at 268, 728 S.E.2d at 152. *Compare* W. Va. Code § 61-8B-3(a)(2) (1991) *with* W. Va. Code § 61-8B-7(a)(3).

The complication in Petitioner's case is that J.M. turned 12 years old on May 26, 1999, thus Petitioner could not (under the State's theory of the crime, i.e., that she was eleven years old or less) have committed first degree sexual assault of J.M. after that date. The case was further complicated by the change in the sexual abuse by a custodian statute during the actual timeframe cited in the indictment.

The 1998 amendment to West Virginia Code § 61-8D-5, sexual abuse by a parent, guardian, or custodian, which took effect in June of 1998 (almost one and one-half years from

40

the May 26, 2000 date contained in Counts 11 through 20 of the indictment) substantially changed the penalty. For crimes committed before the amendment to the statute, the penalty was five to 15 years; for those committed after the amendment, the penalty was ten to 20 years.

However, the Court dealt with this problem in its charge to the jury as well as on the verdict form. The jury, if they found Petitioner M guilty of sexual abuse by a custodian as charged in Count 11 and 12, were asked whether they found the crime was committed before or after June 12, 1998 (the date the amendment to West Virginia Code § 61-8D-5 took effect). The jury found that the crime charged in the twelfth count was committed after June 12, 1998, and it found that the crime charged in the eleventh count was committed before June 12, 1998.

Further, the Court ordered that the State provide to Mr. M and his trial counsel a bill of particulars. In that bill of particulars, which was prepared after the Prosecuting Attorney had an opportunity to interview the victim, the State alleged that J.M. would testify about five specific instances of sexual assault/abuse. The Court also dismissed 14 of the 20 counts after the State's case-in-chief because evidence did not exist to send those charges to the jury.

Based on those considerations, the Court finds that the Petitioner has failed to show that he was denied due process of law based on the indictment. He was placed on fair notice of the charges against which he had to defend, and he was able to present a defense, albeit an unsuccessful one. Time was not an element of the offense, although under the unique circumstances of this case, it did impact the potential penalty. To that end, the jury was instructed to determine when the crimes were committed, and Petitioner M was sentenced in accordance with those findings.

For these reasons, the Court finds no merit to Petitioner's argument that he was denied due process of law by being charged under a defective indictment.

41

## C. Willful Presentation of Fraudulent Testimony by Corporal Wotring Before the Grand Jury

Petitioner contends that he has been denied his rights under the Fifth Amendment to the Constitution of the United States and Article III, § 10 of the Constitution of the State of West Virginia. He alleges that Corporal Wotring presented willful, intentional fraud to the Grand Jury, and this erroneous grand jury testimony substantially influenced the decision to indict him. (Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus at 31-32.)

"Except for willful, intentional fraud the law of this State does not permit the court to go behind an indictment to inquire into the evidence considered by the grand jury, either to determine its legality or its sufficiency." Syl. pt., *Barker v. Fox*, 160 W. Va. 749, 238 S.E.2d 235 (1977); Syl. pt. 2, *State ex rel. Pinson v. Maynard*, 181 W. Va. 662, 383 S.E.2d 844 (1989).

As noted earlier in this opinion order, Corporal Wotring's testimony before the grand jury was not wholly accurate as it related to Michael M      's statement. Nevertheless, Petitioner has failed to show that Corporal Wotring willfully presented fraudulent testimony. His grand jury testimony is couched in its own caveat: "He acknowledged at least *I think* five or six times he said that he has performed oral sex on his daughter." (Grand Jury Tr. 7 (emphasis added).) Petitioner has not provided the Court with any other evidence regarding Corporal Wotring's grand jury testimony. Accordingly, Petitioner M      has failed to show by a preponderance of the evidence that the testimony was willfully fraudulent.

Assuming *arguendo* that Corporal Wotring's grand jury transcript was willfully fraudulent, the findings of guilt by the petit jury cured any assumed deficiency in the grand jury testimony. *See United States v. Mechanik*, 475 U.S. 66, 70 (1986) ("[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a

42

reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt."). *See also Talamante v. Romero*, 620 F.2d 784, 791 (10th Cir. 1980) ("Even if the perjured testimony had been brought to the attention of the grand jury, it seems highly unlikely, in view of the petit jury's later finding of guilt after a full trial, that the grand jury would have failed to indict based on probable cause."); *Lopez v. Riley*, 865 F.2d 30 (2nd Cir. 1989) (holding that any claims of deficiencies in state grand jury proceedings are generally not cognizable in a habeas corpus proceeding in federal court because any deficiencies have been rendered harmless by conviction at trial by a petit jury under a heightened burden of proof); *Grant v. Ricks*, Nos. 00-CV-6861 JBW, 03-MISC-0066 JBW, 2003 WL 21847238 (E.D.N.Y.) (Weinstein, J.) (holding that claim that victim presented perjured testimony before grand jury was not cognizable upon habeas review and that "[t]he relevant question is whether materially false testimony was introduced at trial").

Because Petitioner has failed to prove by a preponderance of the evidence that Corporal Wotring willfully and fraudulently presented testimony to the Grand Jury, and because any alleged deficiency was nevertheless cured by the petit jury trial with all of its procedural protections, this Court finds and concludes that this ground is without merit.

### D. Prosecutor Improperly Read a Transcript That Had Been Deemed Inadmissible When Cross-Examining Witnesses

Petitioner contends that his petition for writ of habeas corpus should be granted because the Prosecuting Attorney read portions of the transcribed statement in front of the jury while cross-examining Petitioner during his trial testimony. (Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus at 33-36.) This Court had ruled at trial that the recorded audio statement of Petitioner M      was admissible; however, the transcribed statement would not be admitted as

43

evidence. During Prosecuting Attorney Brown's cross-examination of Petitioner M      , he

questioned Petitioner M      about the statement he gave to Corporal Wotring. For example,

Prosecutor Brown stated:

Q:    Did you give him this answer? She said that I was playing with her. It overcome her and she wound up sitting on my chest.
A:    Yes.
Q:    Was that a true answer?
A:    That's what she told me happened, yes.
Q:    And then he asked you the next question. How many times has this occurred and I'm going to ask you did you give him this answer. Oh, I woke up probably four or five times in the last couple of years.
A:    Probably.
Q:    Is that correct?
A:    Probably. I understand that answer is in the – in my statement. I have read that statement three million times since I was arrested. Exactly what I said that night I can't tell you.
Q:    I want you to tell the jury when the next four or five times occurred that you woke up with your daughter naked from the waist down sitting on your chest.
A:    That's not how I meant that answer.
Q:    How did you mean it?
A:    I meant that answer that is how many times it either happened or me and my daughter had discussed it.
Q:    Well, the question was how many times has this occurred?
A:    I understand what the question was.
Q:    And you said I woke up four or five times in the last couple of years?
A:    Yes. I did not mean how many times I woke up with her sitting on my chest. I meant how many times – I took the question to mean how many times total had anything happened between us.
                                    * * *
Q:    As far as holding her down, she's been naked a couple of times. I have been naked all the time.
A:    Yes, sir.
Q:    Did you make that statement?
A:    Yes, I did.
Q:    Was that true?
A:    Yes. But as I have stated before, when I was – whenever I was naked in the house with the children present, especially in the bedroom, I was covered with either a sheet or a blanket. The two times she was naked she, no, neither one of us had clothes on, but we were both covered. If one of my kids, even the youngest one, would want to lay down with me in the bed, I would be under the sheet and a blanket – I would pull the blanket back and make her lay on top of the sheet and cover her back up.

44

Q: Then Corporal Wotring asked you have you ever stuck your finger in her vagina. And your answer was yes – excuse me – your answer was she says I have. Not while I was awake I haven't.
A: That's right.
Q: Was that your answer?
A: Yes, it was.

(Trial Tr. 589-92.)

After this Court's review of the trial transcript, the Court finds and concludes that Prosecutor Brown's cross-examination was similar to the above quoted portion of the transcript. (*See* Trial Tr. 589-630.) Prosecutor Brown asked Petitioner M_____ about a specific portion of M_____s statement, and Petitioner M_____ was given the opportunity to explain his answer to Corporal Wotring. The Court further finds and concludes that Petitioner M_____ did not dispute the accuracy of what Prosecutor Brown asked him; he did, however, at times indicate that what he said was perhaps not what he meant. (*See, e.g.,* Trial Tr. at 597 ("Q: And then he asked you [did you place your penis] near her anus and did you give him this answer. Maybe while I was holding her down and tickling her. A: Well, if you're sitting on a young lady's legs while you're tickling her and your crotch is near her rear end, yes, you may be near her anus. I mean, every time somebody sits on your lap your penis may be near her anus.").)

Petitioner, in his Memorandum of Law, cites *State v. Guthrie,* 194 W. Va. 657, 461 S.E.2d 163 (1995), for the proposition that Petitioner M_____s conviction should be reversed because the Prosecuting Attorney abandoned his role as a quasi-judicial officer and made "highly prejudicial statements before the jury."[20] (Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus at 33.) This Court finds and concludes that *State v. Guthrie* is not on point.

---

[20] In *Guthrie,* the Court stated that with allegations of prosecutorial misconduct, "[t]he inquiry focuses on the fairness of the trial and not the culpability of the prosecutor because allegations of prosecutorial misconduct are based on notions of due process." 194 W. Va. at 677 n.25, 461 S.E.2d at 183 n.25. Accordingly, this Court finds and concludes that this ground is based on a constitutional right. *See* U.S. Const. amend. 14; W. Va. Const. Art. III, § 10.

In *Guthrie*, the prosecuting attorney informed the jury during closing argument what the possible penalties were for the various levels of homicide, and the prosecuting attorney cross-examined the defendant's father about statements the defendant had allegedly made to the effect that "men were better than women and women should stay at home, that whites were better than blacks, and whether the two of them discussed the Ku Klux Klan." *Guthrie*, 194 W. Va. at 679, 461 S.E.2d at 185. The Court held first that the prosecutor's mention of punishment (outside the recommendation of mercy analysis) was improper; second, injecting the defendant's racial biases, when the case was not about race, was improper. Both issues caused the Court to have "grave doubt" whether the errors were harmless. 194 W. Va. at 685, 461 S.E.2d at 191.

Petitioner's case bears no relation whatsoever to *Guthrie*. The alleged misconduct of the prosecutor in this case does not touch upon improper questioning regarding racial, ethnic, gender, or political biases as in *Guthrie*. Instead, Prosecutor Brown simply asked Petitioner M about the statement he made to Corporal Wotring. Further, Prosecutor Brown actually assumed his quasi-judicial role by allowing Petitioner M to attempt to explain his answers to Corporal Wotring. The fact that Prosecutor Brown during his cross-examination may have read portions of the statement from a prepared transcript that was not admitted at trial under a best evidence analysis does not render his questions based on the transcript improper. *See* Syl. pt. 3, *State v. Hardesty*, 194 W. Va. 732, 461 S.E.2d 478 (1995) (holding that audio and video tape recording transcripts are demonstrative aids and should not be admitted as evidence). This Court finds no merit to this ground.

### E. Trial Court Improperly Denied Request for Continuance

Petitioner contends in his Petition for Writ of Habeas Corpus that he was denied the constitutional right to a fair trial when the Court denied his motion for continuance on the

46

morning of the trial. Petitioner contends that because the bill of particulars was given to him the day before trial, he did not have a reasonable time to prepare his defense. He contends that if he had the dates the crimes were alleged to have taken place, he "would have been able to secure work records which may have established an alibi . . . ." (Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus at 37.) Petitioner contends that after trial, he was able to procure work records that "may have served as an alibi for the dates of the alleged incidences . . . ." (*Id.* at 12, ¶ 23.) Petitioner directs the Court to "attachment V" which are allegedly the work records that would have provided his alibi defense – however, Petitioner does not explain to the Court how they would have provided him an alibi at trial.

The Court finds and concludes that in some instances the failure to grant a continuance can violate a criminal defendant's constitutional right to a reasonable time to prepare a defense. *See* Syl. pt. 3, *Wilhelm v. Whyte,* 161 W. Va. 67, 239 S.E.2d 735 (1977) ("There may be occasions when the denial of a continuance in a criminal trial is so arbitrary as to violate due process, and because of the particular wording in Article III, Section 14 of the West Virginia Constitution, that the accused 'shall have the assistance of counsel, and a reasonable time to prepare for his defense', there is, independent of the Due Process Clause in our Constitution, a constitutional right to a continuance if the defendant is not accorded a reasonable time to prepare his defense."). However,

> [t]he granting of a continuance is a matter within the sound discretion of the trial court, though subject to review, and the refusal thereof is not ground for reversal unless it is made to appear that the court abused its discretion, and that its refusal has worked injury and prejudice to the rights of the party in whose behalf the motion was made." Syl. pt. 1, *State v. Jones,* 84 W.Va. 85, 99 S.E. 271 (1919).

Syl. pt. 1, *State v. Davis,* 176 W. Va. 454, 345 S.E.2d 549 (1986).

47

Further, "[a]bsent some particular showing of how late production of court-ordered discovery has affected the petitioner's right to a fair trial, late production alone will not suffice to reach the constitutional level of denial of a fair trial." *Wilhelm v. Whyte*, 161 W. Va. 67, 74, 239 S.E.2d 735, 739 (1977). In *Whyte*, the Court further stated that "because this is a habeas corpus proceeding, we must assess this claim from the standpoint of whether the lack of this evidence [discovery ordered by the court but produced late], viewed from the totality of the record, resulted in the denial of a fair trial." 161 W. Va. at 75, 239 S.E.2d at 739.

The Court finds that this ground in Mr. M___'s Petition for Writ of Habeas Corpus is without merit for two reasons. First, it is not entirely accurate, viewing the totality of the record, that Petitioner M___ was only put on notice of the contents of the bill of particulars one day before trial. On August 7, 2001, the day before trial commenced, at a hearing on the voluntariness of the statement Mr. M___ gave to Corporal Wotring, the Court inquired about the bill of particulars. Prosecuting Attorney Brown told the Court the following:

> Your honor, that should be ready to be given to Mr. Goodrich [Petitioner's trial counsel] following this hearing or shortly thereafter, but what I did was because it was being delayed getting typed, Jaunetta Likins and I went over her notes of the interview with the victim with Mr. Goodrich and gave him the dates and times and places where the alleged acts occurred so that he would have that for purposes of preparing, even though he doesn't have it in writing yet.

(Trial Tr. 185.) The Court asked "[w]hen did you verbally tell it to him?" (*Id.* at 185-86.) Prosecutor Brown replied, "On Monday. Monday afternoon." (*Id.* at 186.) Mr. Goodrich, when asked by the Court, agreed that he had been verbally informed of the contents of the bill of particulars on Monday afternoon. (*Id.*) Thus, although he was not given the written bill of particulars until the day before trial, he was on notice of the contents two days prior to trial.

Second, and more importantly, Petitioner has failed to show by a preponderance of the evidence that the denial of motion for continuance denied him his constitutional right to a fair

48

trial. Despite the late production of the court-ordered bill of particulars, Petitioner has not directed this Court to any evidence to show that it deprived him of an ability to set forth a plausible alibi defense. Petitioner has not sought, either in his Petition, Memorandum, or in his Proposed Findings of Fact and Conclusions of Law, to show that he has any evidence to prove he was somewhere else during the commission of the crimes. The testimony that Petitioner was convicted upon – primarily that of J.M. that established five separate incidents – did not include exact dates, and instead J.M. generalized a timeframe such as "in the wintertime" of December 1999 or January of 2000. (Trial Tr. 355.) The Bill of Particulars contains only one specific date – that of May 4, 2000, before Petitioner went to work – and Petitioner has not shown this Court that he was not at his home with J.M. at the time the crime was committed. Petitioner's work schedules would not have provided him a plausible defense at trial.

For those reasons, based on the totality of the record, the Court finds that the denial of the continuance did not rise to a violation of Petitioner's constitutional right to have a reasonable period of time to prepare his defense.

### F. Trial Court Erred by Admitting the State's Inadmissible Evidence

Petitioner contends that this Court erroneously allowed the admission of his statement given to Corporal Wotring and physical evidence seized from his residence after his arrest.

### i. Petitioner's Statement to Corporal Wotring

Petitioner contends that his statement to Corporal Wotring was erroneously admitted because it was not given voluntarily. Petitioner contends that Corporal Wotring told him that D M , Petitioner's father, was going to kill him for what he did to J.M. Petitioner further contends that Corporal Wotring promised to put him in some sort of protective custody, and

49

thus protect him from his father, in exchange for giving a statement. (Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus at 39-42.)

This Court has already ruled on the voluntariness of Petitioner M___s statement to Corporal Wotring. During a hearing conducted on August 7, 2001, Corporal Wotring testified and was subject to cross-examination by then-defendant M___. Corporal Wotring testified that "I advised him that -- of the tense situation that was at the household there. Basically read him his Miranda Rights, asked him if he understood his rights, whether I had threatened him, promised him, intimidated him in any way which he advised no." (Trial Tr. 77.) The statement, which was recorded by Corporal Wotring, confirms that Michael M___ at that time agreed that he had not been threatened by Corporal Wotring nor did Corporal Wotring promise him anything in exchange for the statement.

On cross-examination during the suppression hearing, Corporal Wotring agreed that "something of that nature was probably related to" M___ when asked if he "t[old] him that his father had a loaded gun and had actually said that he was going to shoot him[.]" (*Id.* at 99.) Michael M___ also testified at the suppression hearing. He testified the following way:

> He then told me that my father had a loaded pistol and had said that he was going to kill me for what I had done to J[.] And he told me that he could protect me. If I gave him some kind of a statement, he would put me in protective custody so my dad didn't shoot me.

(Trial Tr. 151.)

This Court listened to the recorded audio statement during the suppression hearing. At the conclusion of the hearing, the Court, considering the totality of the circumstances, found that the statement was freely and voluntarily made. (*See* Trial Tr. 178-79.)

To be admissible, a statement given by a defendant must be found to be voluntarily made. *See* Syl. pt. 2, *State v. Goff*, 169 W. Va. 778, 289 S.E.2d 473 (1982) ("A confession that

50

has been found to be involuntary in the sense that it was not the product of the freewill of the defendant cannot be used by the State for any purpose at trial.").

"When evaluating the voluntariness of a confession, a determination must be made as to 'whether the defendant knowingly and intelligently waived his constitutional rights' and whether 'the confession . . . [was] the product of an essentially free and unconstrained choice by its maker.'" *State v. Bradshaw*, 193 W. Va. 519, 534, 457 S.E.2d 456, 471 (1995) (quoting *State v. Slaman*, 189 W. Va. 297, 300, 431 S.E.2d 91, 94 (1993)). Although the determination of the voluntariness of a waiver of *Miranda* rights and the voluntariness of a confession are separate, *Bradshaw*, 193 W. Va. at 534, 457 S.E.2d at 471, the signing of a waiver of *Miranda* rights after having those rights explained is an important factor to be considered. *See Slaman*, 189 W. Va. at 300-01, 431 S.E.2d at 94-95.

Other "important factors bearing on voluntariness include actual threats or physical intimidation, mental coercion, the length and form of confinement, deceptions, inducements, and/or other forms of psychological pressure." *Bradshaw*, 193 W. Va. at 534, 457 S.E.2d at 471. No single factor is determinative, and the Court must examine the totality of the circumstances. *Bradshaw*, 193 W. Va. at 534-35, 457 S.E.2d at 471-72; *see* I Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure*, I-414 (1993) ("Whether an admission is voluntary or induced by duress or coercion is to be determined from the totality of the circumstances . . . .The rules are general only [and] [t]he cases have been decided on an *ad hoc* basis.").

Justice Cleckley, writing for the Court in *Bradshaw*, held that the case law in West Virginia concerning unlawful inducements could be summed up the following way: "this Court only will find a confession invalid if the statements of the authorities promised some specific

51

form of leniency, the defendant reasonably believed the promise could be carried out, and/or the defendant's mental freedom was overcome." *Bradshaw*, 193 W. Va. at 535, 457 S.E.2d at 472.

The Court finds and concludes that Petitioner M       was read and indicated his understanding of the *Miranda* warnings given to him by Corporal Wotring. (*See* Statement at unnumbered 1-2; State's Trial Ex. 1 (Statement of Miranda Rights and Waiver of Rights).) Further, during his recorded statement, Petitioner M       indicated on two occasions – at the beginning and at the end – that he was not promised anything nor was he threatened in any way to give the statement. The only evidence Petitioner M       has presented to the Court to show that he was coerced into giving the incriminating statement is his own self-serving testimony at the August 7, 2001 suppression hearing and during his testimony to the jury at trial. The Court finds that his testimony is belied by his own recorded statement and the trial testimony of Corporal Wotring. The Court further finds that the jury was charged by this Court that it should consider whether the State had shown by a preponderance of the evidence that the statement was freely and voluntarily made. (Judge's Charge to the Jury at 8.) To the extent the jury considered the statement (which is pure speculation), it would have had to have rejected Petitioner's trial testimony as to the voluntariness of his statement. To the extent it found otherwise and did not consider the statement, Petitioner was not harmed by the statement's introduction. Either way, pursuant to Syllabus Point 4, *State v. Vance*, 162 W. Va. 467, 250 S.E.2d 146 (1978), which allows the jury to consider the voluntariness of a defendant's statement, the voluntariness of the statement was a factual matter for the jury's determination after the initial finding by this Court. For those reasons, the Court finds and concludes that Petitioner M       has not proven that his statement was involuntarily given by a preponderance of the evidence.

52

## ii. Admission of Evidence Seized from Petitioner's Home

Petitioner also contends that the Court erroneously admitted illegally seized evidence from his home. As a basis for this assertion, Petitioner contends that his wife, C    M did not consent to the search of the home. (*See* Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus at 42-43.)

The factual underpinnings of the search of Petitioner's home began when C     'M called the Preston County Sheriff's Department on the night of May 9, 2000, to report that her daughter had told her that her father, Petitioner M    , had sexually abused her. Corporal Wotring testified that he went to the M    's residence and took a brief statement from J.M. in his cruiser outside of the home. (*See* Trial Tr. 97-98.) When Michael M     returned home from work, Corporal Wotring met him outside and took what this Court considers a voluntary statement from him. (*Id.* at 100.) After taking the statement from J.M. and Michael M    , the decision was made to arrest M     m sexual abuse charges. (*Id.* at 103.)

Corporal Wotring testified at the suppression hearing that he did not have a search warrant for the residence, but his recollection was that C    M    gave him the items. (*Id.* at 107.) He was sure, however, that he received verbal consent from Ms. M     (*Id.*) He testified:

> I went over it that we would like to go into the residence. Would you have a problem with that, you know, and here is what we are looking for, whatever type of items that we would be looking for which is sexual paraphernalia, probably the bed clothes, that sort of thing, and she took us to the residence.

(*Id.* at 108.)

53

C    M    , who this Court notes later decided to support her husband but changed that position drastically after his conviction,[21] testified during the August 7, 2001 suppression hearing when asked whether Corporal Wotring went over the consent with her, she stated, "Not that I know of." (*Id.* at 122.) She stated that she "was told that we had to go up to the house and get evidence." (*Id.*) In response to the question whether she felt she had any right to object to [Corporal Wotring] searching the home[,]" she replied, "Then I had no clue what was going on a hundred percent." (*Id.*)

> The general rule is that the voluntary consent of a person who owns or controls premises to a search of such premises is sufficient to authorize such search without a search warrant, and that a search of such premises, without a warrant, when consented to, does not violate the constitutional prohibition against unreasonable searches and seizures.

Syl. pt. 8, *State v. Plantz*, 155 W. Va. 24, 180 S.E.2d 614 (1971); Syl. pt. 3, *State v. Worley*, 179 W. Va. 403, 369 S.E.2d 706 (1988).

"Whether a consent to search is in fact voluntary or is the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Syl. pt. 8, *State v. Craft*, 165 W. Va. 741, 272 S.E.2d 46 (1980); Syl. pt. 4, *State v. Worley*, 179 W. Va. 403, 369 S.E.2d 706 (1988).

Important to the analysis in the case at bar, a law enforcement officer is under no constitutional obligation to advise a person of the right to refuse to a consent search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973) ("[W]e cannot accept the position of the

---

[21] By letter dated July 18, 2002, prior to a hearing on Petitioner M    's Rule 35(b) motion for reconsideration of sentence, C    M    wrote: "I know for a while I was supporting my husband on this case. I have been threw [sic] counseling and with that help and my three daughter[']s help got over the fear and like brain washing he did to me. . . . I hope the courts will not allow a person like this to get out early." The Court finds this relevant to this analysis because it helps explain why C    M    who initiated the investigation into her husband, later provided testimony on his behalf.

54

Court of Appeals in this case that proof of knowledge of the right to refuse consent is a necessary prerequisite to demonstrating a 'voluntary' consent.").

In this case, C    M     called the police regarding the sexual abuse allegations that led them to her home. She voluntarily, upon the advice of law enforcement, went to the Magistrate Court to obtain a domestic violence protective order based on those allegations. (*See* Trial Tr. 115.) Corporal Wotring's testimony established that C    M     retrieved the items for him. Ms. M    's testimony is equivocal regarding whether she consented; instead, she testified that she was not sure what was going on. The record shows it is undisputed that she actually provided most of the items to Corporal Wotring.

This Court finds and concludes that Petitioner M     has failed to prove by a preponderance of the evidence that C    M     did not voluntarily consent to the search of the home that led to the seizure of the items introduced at trial. C    M     initiated the investigation into Petitioner's conduct by involving law enforcement, and after he was arrested, she retrieved the requested items. It is undisputed that she had the capacity to consent to the search of the home. Considering the totality of the circumstances, and especially that C    M     was the complainant, the Court does not find that the items were retrieved without the consent of Ms. M    .

### G. Biased Presentence Report

Petitioner contends that he was denied due process of law because Jaunetta Likins, who had previously been the victim's advocate in the Prosecuting Attorney's office, later became a probation officer and prepared his presentence report. Petitioner contends that Ms. Likins was biased in the preparation of the report. (Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus at 44-47.)

55

"A defendant has a due process right to be sentenced on the basis of accurate information." *State v. Craft*, 200 W. Va. 496, 499, 490 S.E.2d 315, 318 (1997) (citing *United States v. Tucker*, 404 U.S. 443 (1972) (holding that trial judge erred by relying on constitutionally invalid prior convictions when sentencing defendant)).

The Court finds and concludes that Jaunetta Likins prepared the presentence investigation report while she was on temporary assignment with the probation department. The Court further finds and concludes that prior to and during Mr. M 's trial, she had been the victim's advocate in the Prosecuting Attorney's office. The presentence investigation report recommended that "the defendant be sentenced to the penitentiary." (Pre-sentence Investigation, Sep. 17, 2001, Case No. 00-F-71.)

During the October 22, 2001 sentencing hearing, the Court asked if "both counsel and their respective clients received a copy of the presentence investigation report" and whether "either one of them wish[ed] to offer any additions or corrections to the report." (Trial Tr. 746.) Defendant, through trial counsel Goodrich, "object[ed] to the consideration of that report because it was done by, I mean, she worked for the prosecutor's office and immediately came over and wrote the report as probation officer." (*Id.* at 747.) Trial counsel Goodrich indicated that he had not "sat down with the defendant and gone through it item by item" because they objected to Ms. Likins's preparation of the report in its entirety. (*Id.*)

Petitioner M relies on *State v. Suchocki*, 208 Wis.2d 509 (Wis. Ct. App. 1997), for the proposition that "[w]hen a presentence report is submitted by a potentially biased investigator, many states require the Court take remedial measures to ensure the due process rights of the defendant are upheld." (Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus

at 44.) This Court finds that *Suchocki* does not lead this Court to find a denial of Mr. M        's due process rights at sentencing.

In *Suchocki*, the agent who prepared the presentence investigation report was married to the prosecuting attorney. The Wisconsin Court of Appeals agreed that the marital relationship was "sufficient to demonstrate bias" and that "it is improper for a biased writer to prepare a PSI . . . ." 208 Wis.2d at 513. Nevertheless, the Court of Appeals concluded that Suchocki was not prejudiced "because the sentencing process was not improperly influenced by the presentence investigation report." *Id.* The court reasoned that, "[i]n the absence of any claimed factual error, the information presented by a PSI may be considered by the court in its sentencing determination." *Id.* at 515. Although Suchocki was able to demonstrate bias as a matter of law, he was unable to show that the biased report prejudiced the sentencing process. The court reasoned that "the ultimate sentence imposed by the court closely paralleled the recommendations of the alternate PSI submitted by the defense [that was prepared by a social worker][;]" second, "the court expressly relied on Suchocki's uncontroverted conduct rather than on recommendations contained in the PSI reports in imposing sentencing[;]" and "even more compelling . . . the court's clear commitment to a sentencing process sufficiently removed from any influence by the tainted PSI." *Id.* at 521-22.

Thus, this Court does not conclude that *Suchocki* stands for the proposition, as stated by Petitioner M        , that a remedial measure must be taken. Instead, *Suchocki* stands for the proposition that for a defendant to claim he was denied due process of law in his sentencing, he must show both bias and actual prejudice. The Court further notes that *Suchocki* was abrogated by *State v. Teipelman*, 291 Wis.2d 179 (2006), wherein the Supreme Court of Wisconsin held that the burden should not be on the defendant to show actual prejudice; instead, the defendant

57

must show "both that the information was inaccurate and that the court actually relied on the inaccurate information in the sentencing." *State v. Teipelman*, 291 Wis.2d 179, 192-93 (2006). "Once actual reliance on inaccurate information is shown, the burden then shifts to the state to prove the error was harmless." *Id.*

Petitioner M      also directs this Court to *O'Connor v. State*, 590 N.E.2d 145 (Ind. Ct. App. 1992). In *O'Connor*, the probation officer who prepared the presentence report was married to a police officer who participated in O'Connor's capture, after a high-speed chase in vehicles. The probation officer recommended the maximum sentence on each of his counts. The Indiana Court of Appeals reasoned that

> [b]eyond the probation officer's marital status, however, he has failed to show, or even to allege, how the probation officer was biased against him. We agree with O'Connor that the better practice would have been to assign the case to a probation officer not related to one of the police officers. Nonetheless, even if error exists, an appellant is not entitled to reversal unless the error was prejudicial. . . . O'Connor has failed to show prejudice here.

> First, as we have already stated, O'Connor offers no facts to show the probation officer was biased against him. Second, at the sentencing hearing, O'Connor cross-examined the probation officer about her relationship with the police officer, thereby revealing to the trial judge any bias the probation officer may have had. Third, **O'Connor does not challenge the information contained within the presentence report**. Finally, the trial judge was not bound by the probation officer's recommended sentence.

*O'Connor v. State*, 590 N.E.2d 145, 149 (Ind. Ct. App. 1992) (emphasis added).

In *State v. Craft*, 200 W. Va. 496, 490 S.E.2d 315 (1997), the issue did not involve potential bias of the preparer of the presentence investigation report; instead, it concerned factually inaccurate information contained in the report. The report contained information regarding "prior assaults and behaviors" for which no factual basis apparently existed. The trial court judge sentenced the defendant to life in prison without the possibility of parole. The defendant thereafter filed a Rule 35(b) motion for reconsideration in which he alleged the

58

inaccuracy of the report, which had been briefly raised at the first hearing. The trial court denied the motion, and the defendant appealed, alleging that the trial court failed to comply with the mandatory requirements of Rule 32(c)(3)(D) of the West Virginia Rules of Criminal Procedure.

Rule 32(c)(3)(D), in sum, requires a sentencing court upon an allegation of incorrect information to either make a finding as to the allegation or a determination that the matter will not be taken into account at the sentencing, and to provide a written determination so that, *inter alia*, "subsequent recipients of the report are explicitly and specifically apprised of the court's basis for the sentence imposed."[22] *Craft*, 200 W. Va. at 500, 490 S.E.2d at 319 (quoting *United States v. Rantz*, 862 F.2d 808, 814 (10th Cir. 1988)). The Court held in Syllabus Point 1 the following:

> Pursuant to *W. Va. R. Crim. P.* 32(c)(3)(D), if the comments of the defendant and his counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the West Virginia Board of Parole.

Syl. pt. 1, *State v. Craft*, 200 W. Va. 496, 490 S.E.2d 315 (1997).

Despite the failure of the trial court in *Craft* to follow Rule 32, the Supreme Court of Appeals held that defendant never alerted the trial court to its specific failure. Although Craft had argued that the report was inaccurate, he never mentioned Rule 32 to the trial court, and

---

[22] The *Craft* decision was based on the 1985 version of Rule 32. The West Virginia Rules of Criminal Procedure were amended in 1996, and the pertinent portion of Rule 32 at issue in *Craft* is now found in Rule 32(c)(1). It now states, and stated at the time of Petitioner's sentencing, that "[f]or each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not effect, sentencing." W. Va. R. Crim. P. 32(c)(1) (1996). The Court finds and concludes that the amendments to the Rules of Criminal Procedure have no effect on the *Craft* holding.

thus failed to preserve that particular error for appeal. The Court nevertheless considered it under the plain error doctrine, and the Court held that given the aggravated circumstances of the brutal stabbing by Craft, the failure to follow Rule 32 did not affect his substantial rights. 200 W. Va. at 503, 490 S.E.2d at 322.

This Court finds and concludes that these cases all demonstrate that a criminal defendant has a due process right to be sentenced on the basis of accurate information. The Court further finds and concludes that Petitioner M , despite a broad claim of bias, does not contend that the information in the presentence investigation report was inaccurate.

The Court assumes *arguendo* (without actually making that finding under these circumstances) that Ms. Likins was biased. At the sentencing hearing, Petitioner M did not alert the Court to any alleged factual errors. Instead, he stated he had not gone over it because he objected to it entirely on the grounds that Ms. Likins was allegedly biased. Mr. M still has not attempted to show the Court that the information contained in the report is inaccurate; instead, he merely claims bias. He has now had three opportunities before this Court, namely at his sentencing hearing, his hearing on his Rule 35(b) motion, and at his omnibus hearing, to demonstrate to the Court how the presentence report was factually inaccurate as a result of the alleged bias. He has completely failed to do so.

This Court finds and concludes that the constitutional right involved in this issue is the right to be sentenced based on accurate information. He has merely claimed bias; he has not shown, nor made any attempt to show, that the information contained in the presentence investigation report was inaccurate. Thus, the Court finds and concludes that Petitioner M has failed to prove a deprivation of this constitutional right by a preponderance of the evidence.

60

The Court further notes that Mr. M was sentenced within the statutory limits. In fact, all but two of the six counts he was convicted on were run concurrently. Mr. M was susceptible to a considerably lengthier period of incarceration than this Court actually sentenced him to.

Finally, the Court primarily based its sentencing order not on the contents of the presentence investigation but on the actions of Mr. M as found by the jury:

> The [C]ourt is imposing this sentence, Mr. M , for the reason that you have denied responsibility in this action. You have consistently placed blame on your daughter, the victim in this case. You were in a position of trust at the time of the events that led to your conviction. The court also is considering the violent nature of the offenses with which you have been convicted.

(Trial Tr. 772.)

The Court notes that the presentence investigation report, at least factually, was not unfavorable to Mr. M It recites that he had no prior juvenile or adult record; he worked; and he was a military veteran. However, he was convicted of sexual assault in the first degree, and five counts of sexual abuse by a custodian. The Court specifically found at sentencing that "probation would unduly depreciate the seriousness of the crime . . . ." (*Id.* at 773.)

For those reasons, the Court finds and concludes that Petitioner M has failed to show by a preponderance of the evidence that he was unconstitutionally sentenced based on inaccurate information.

### H. Cumulative Erros

As his final ground asserted in his Memorandum of Law in Support of Petition for Writ of Habeas Corpus, Petitioner M contends that the cumulative errors in his trial resulted in a deprivation of his constitutional right to a fair trial. (Mem. of Law in Supp. of Pet. for Writ of

61

Habeas Corpus at 47.) Because the Court finds no constitutional error at all, *see supra*, the Court further finds and concludes that the cumulative error doctrine is inapplicable.

## CONCLUSION

For the reasons detailed in this Opinion Order, the Court finds and concludes that Petitioner has failed to prove the allegations in his Petition for Writ of Habeas Corpus by a preponderance of the evidence. Accordingly, the Court does hereby

**ORDER** that Michael M        's Petition for Writ of Habeas Corpus is denied. The Court further

**ORDERS** that any ground not initially waived by Petitioner M        that he has otherwise failed to develop is hereby waived.

Petitioner is saved his exceptions and objections to the rulings of the Court. It is further

**ORDERED** that the Clerk of the Court personally deliver or send via first-class mail a certified copy of this Order to Wiley Newbold, counsel for Petitioner M        and to Prosecuting Attorney Melvin C. Snyder, III, counsel for Respondent Warden.

**ENTER** this 29 day of November, 2016.

Lawrance S. Miller, Jr., JUDGE

**ENTERED** this 29 day of November, 2016.

Betsy Castle, CLERK

By: Lisa Leishman deputy

62